JUDGE GOFER
delivered the opinion oe the court.
The appellant was indicted in the Kenton Criminal Court, at its June Term, 1874, for the murder of Harvey Myers.
At the same term he filed his petition therefor, and the venue was changed to the county of Boone, where a trial was had at the March Term, 1877, which resulted in a verdict and judgment convicting him of the crime of voluntary manslaughter. This appeal is prosecuted to obtain a reversal of that judgment.
At the October Term, 1874, the appellant moved to set aside the indictment, mainly on the ground that the grand jurors by whom it was found were not selected by commissioners, as required by statute, and were summoned by a sheriff who was not sworn, as required by law.
The court overruled the motion, and the appellant excepted. That decision was rendered while the Criminal Code of 1854 was in force. Under its provisions this court had no power to reverse a judgment of conviction for error in overruling a motion to set aside an indictment. (Sec. 334; 17 B. Monroe, 316, 408.)
But it is contended that we may now reverse for such error, whether committed before or after January 1, 1877, when the present Code went into effect.
Section 340 of the Code of 1877 provides, “A judgment of conviction shall be reversed for any error of law, to the defendant’s prejudice, appearing in the record.”
Sections 280 and 281 read as follows:
“ Sec. 280. Upon the tidal of criminal or penal prosecutions, either party may except to any decision of the court by which the substantial rights of such party are prejudiced, subject to the restrictions in the next section.
*251 “Sec. 281. The decisions of the court upon challenges to the panel, and for cause, upon motions to set aside an indictment, and upon motions for new trials, shall not be subject to exception.”
Construing these sections ^340 and 280 and 281 together, it seems to us clear that we have no power under the present Codfe to reverse on the appeal of either party for error in decisions upon challenges to the panel, or for cause, or upon motions to set aside an indictment, or for a new trial.
The language of section 340 embraces all such errors; but unless that language is held to be modified by section 281, sections 280 and 281 would seem to be entirely superfluous. They were wholly unnecessary unless the purpose was to except errors in decisions, upon the matters enumerated, from the revisory power of this court.
It is next objected that the court erred in admitting important evidence against the appellant, notwithstanding his objection and exception.
The Commonwealth introduced a witness who swore that about six or eight weeks before Myers was killed he was in the office of Marshall & Piatt; that appellant had a desk in the room, and while he (witness) was talking to Piatt at one end of the room he heard the appellant talking to Winston at the other end; that he did not hear all that was said, but heard the appellant, in an excited and angry manner, say, “ The dirty dog, the dirty hound; I despise him; I could spit in his face, and I will do it;” and that he also said “that Myers, that Myers,” using the latter words in connection with the former.
Whether mere fragments of a conversation alleged to have been had with a person charged with crime, only a part of which was heard by the witness, are admissible in evidence against him must depend upon the circumstances of each case, and the object for which the declarations are offered.
If the object of proving the declarations be, as in this case, *252 to prove malice, or that the prisoner commenced the conflict, any previous declarations which tend to prove ill will toward the deceased, or that the prisoner contemplated an attack upon him, are competent, although made in a conversation only a part of which was heard by the witness. Nothing that could have been said, short of an absolute retraction, could impair the force of declarations alleged to have been made by’ the appellant, and we are of the opinion that evidence of the declarations already recited was properly admitted.
But the witness was permitted to make this further statement, “Terrell also’said in that conversation, ‘he ordered me out of his office because I was not armed/ or, ‘he was afraid to order me out of his office because I was armed / I can not now remember which remark he made, but it was one or the other.”
This statement of the witness should not have been allowed to go to the jury. There is a great difference between the character of the two declarations, only one of which was stated to have been made by the appellant. In one the deceased would seem to have been very clearly in fault, while in the other the fault was appellant’s.
The witness could not state, and did not even give his impression, as to which expression was used. This circumstance, however, probably prevented the evidence of these declarations from having any particular weight with the jury, and we should not be inclined to reverse the judgment, because it was admitted.
The appellant introduced Duncan as a witness, and offered to prove that a short time before the killing of the deceased, he called on the witness, who was commonwealth’s attorney for the district, and stated to him that he had received information that his life had been threatened (not however by the deceased), and inquired whether, under the circumstances, he had a right to carry arms, and that the witness said to him if *253 such threats had been made he had a right to.carry arms for his defense. The Commonwealth objected to the evidence, and the objection was sustained.
Myers was shot with a pistol which the appellant was carrying on his person at the time, and the prosecution relied on that fact as evidence of malice, and his counsel contend that his declarations to Duncan were admissible to show that he carried arms in good faith to defend himself.
If it had been proven by the prosecution that he was armed at the time he made the declarations to the witness, what he said as to the cause that led him to carry arms would- probably have been admissible as part of the res gestea. But no such evidence was offered, and the appellant’s declarations, made an indefinite time before the killing, could not be made evidence to explain the carrying of arms on the day on which it occurred.
The court, after instructing the jury in the law of murder and voluntary manslaughter, gave the following:
“No. 3. The court instructs the jury that if they shall believe, beyond a reasonable doubt, from all the evidence before them, that the accused, in Kenton County, at any time before the finding of this indictment, in a sudden affray, and in sudden heat and passion, without previous malice, and not in his necessary or apparently necessary self-defense, and not in an effort to keep the public peace, with a pistol loaded with powder and a leaden ball or other hard substance, then and there by him held in his hand, did shoot and wound one Harvey Myers, from the effects of which shooting and wounding the said Myers then and there presently died, they should find him guilty of involuntary manslaughter, and affix his punishment at a confinement in the penitentiary for any period of time of not less than one nor more than six years.”
This instruction was evidently given in view of the provisions of section 2, article 4, chapter 29 of the General Statutes, which reads as follows:
*254 “Any person who shall willfully strike, stab, thrust, or shoot another, not designing thereby to produce or cause his death, and which is not done in self-defense, or in an attempt to keep and preserve the peace, or in the lawful arrest or attempt to arrest a person charged with felony or misdemeanor, or in doing any other legal act, so that the person struck, stabbed, thrust, or shot, shall die thereof in six months next thereafter, shall be confined in the penitentiary not less than one nor more than six years. But this section shall not be construed to change the law of malice in respect to any other offense.”
The foregoing instruction was more favorable to the appellant than the law warranted. It wholly omitted to submit to the jury the question Avhether he may not have designed to kill Myers, in which case he was not entitled to any benefit under the statute supra.
That the crime denounced in the statute was inaccurately called involuntary manslaughter in the instruction, can not have prejudiced his substantial rights, and the giving of the instruction furnishes no ground for reversing the judgment.* The appellant asked an instruction which, as modified by the court and given, reads as follows:
“No. 2. The court instructs the jury that if they shall believe from the evidence that the defendant, W. G. Terrell, at the time and place that he shot and killed Myers, had reasonable grounds to believe, and did believe, that Myers was then and there about to take his life, or to inflict on his person some great bodily harm, that Terrell had the right to make use of any means then at his oommand that Avere necessary, or apparently necessary, to avert such impending or apparently impending danger; and if they shall believe, from the evidence, that Terrell, when he fired the shot that killed Myers, had reasonable grounds to believe, and did believe, that Myers Avas then and there about, in any manner, to take his life, or inflict on his person great bodily harm, and that it was neces *255 sary, or apparently necessary, that Terrell should shoot Myers to prevent such loss of life or great bodily harm, and that Terrell, by shooting, used no more force and no other means than were necessary, or apparently necessary, to save his life or person from great bodily harm, that they must acquit him, unless they shall believe from, the evidence, beyond a reasonable doubt, that Terrell sought and himself commenced the conflict.”
The modification made by the court consisted in adding, at the end of the instruction as asked, the words in italics.
The facts attending the homicide, as far as proven in the record, were about these:
A suit for divorce was pending between the appellant and his wife. The deceased was the attorney of Mrs. Terrell. On the day on which the killing occurred depositions were being taken on behalf of the appellant in the office of his attorneys.
The appellant was not present, but came in after the depositions had been completed, and on reading one of them took offense at a question propounded by the deceased, and becoming excited and angry said he would go to the office of the deceased and see him about it. His attorneys attempted to dissuade him, but failed. He left the office and walked rather faster than usual toward the office of the deceased. The attorneys followed and overtook him and again attempted to persuade him not to proceed further, but he replied that he was perfectly cool, and went on. The office of the deceased was on the second floor, and consisted of two rooms. He was in the rear room, and to get to where he was, the appellant had, after ascending the stairs, to pass along a., public hall, from which he could enter the front room of the office. Before entering the office of the deceased he opened the door of Hamilton’s adjoining office and looked in, but did not enter. The next seen of him by any witness who testified on the trial, he and the deceased were struggling and passing down the hall toward the head of the stairs, the appellant between the deceased and *256 the stairway. When they got very near the head of the stairs they separated a foot or two, the deceased being nearer to the stairs and the appellant between him and the wall and nearly touching it. • When the parties separated the appellant was observed to have a pistol in his hand, and with it he shot the deceased.
In view of these facts, the qualification by the court of the instruction asked by the appellant was calculated to have an important bearing on the decision of the case, and if it was not correct was obviously prejudicial to the appellant.
From the facts proven to have occurred at the office of appellant’s attorneys, the fact that, although they followed him and tried to prevail with him not to go to the office of the deceased, he persisted in his intention, and the threat to spit in the face of the deceased, testified to by the witness whose testimony we have before adverted to, the jury may have inferred that the appellant, in the language of the instruction, u sought ' and himself commenced the conflict.” Yet it would not necessarily follow, if he did so, that he did not kill the deceased in the lawful defense of his own person./ /'If he commenced the conflict by assaulting the deceased or tty so menacing him as to justify the reasonable belief that he intended to assault him, the deceased had a right to employ such force as was proportionate to the assault, and as long as appellant kept up the conflict he could not do any thing lawfully in defense of himself.
But if he ceased to fight, and withdrew in good faith from the conflict, by retreating or otherwise, the right of the deceased to employ force ceased, and as soon as that occurred the right of the appellant to defend himself revived/./• (Wharton’s Law of Homicide, secs. 483, 537; 2 Bish. Or. Law, sec. 471; Hittner v. The State, 19 Ind. 48; Evans v. The State, 44 Miss. 762; Evans v. The State, 33 Ga. 4; State v. Linney, 51 Mo. 40; Vaden v. Commonwealth, 12 Grattan, 717; 6 Col. 407; 3 Oregon, 69.) And if after that he found himself in apparent *257 danger of losing his life, or of sustaining great bodily injury, at the hands of the deceased, he had the same right to defend himself that he would have had if he had not originally commenced the conflict.
The law of self-defense is but the law of necessity. If A assaults B feloniously, B may lawfully resist, and if, in doing so, he does that which but for the prior assault would have been a felony, he is excused if he had no other apparent and safe means of escaping the threatened injury. So if A makes a common assault upon B, the latter may resist it with such force as is necessary for his own protection. But if he goes greatly beyond what is necessary he becomes the aggressor. “ The doctrine here is, that although a man is engaged in committing an offense, he loses thereby none of his rights of self-protection, further than the law authorizes the person injured, or another, to make defense, or to arrest the one doing the injury.” (Bish. Cr. Law, vol. 2, sec. 571.)
No one who testified saw the commencement of the conflict. The jury were necessarily left to decide, from circumstances, what took place between the parties between the time when the appellant was at the door of Hamilton’s office and the time when they were seen struggling together in the hall. A conflict had commenced; one of the parties had commenced it; and the jury were to decide which one. If they decided that the appellant commenced it, then they should have been allowed to say whether he had in good faith abandoned the conflict, so that the deceased was no longer under the necessity, or apparent necessity, of keeping it up for his own safety, and should have been told that if he had abandoned the conflict, from that time forward, he had a right to defend himself.
But in view of the fact that no one saw the beginning of the conflict, we are of the opinion that the qualification should not have been made even with the modifications we have suggested.
*258 But, if, on another trial, it should be proven who commenced the conflict, it may be proper to give the instruction with the qualifications we have indicated.
The Commonwealth introduced a witness who, after stating that he came to the deceased in a few moments after he was shot, went on to say of him: “ He was wounded in the abdomen, and was bleeding. He said repeatedly, ‘ I must die; oh, what will become of my poor wife and children!’ I said to him, ‘Oh, no, Mr. Myers, I hope you will get better;’ but he repeated ‘ I must die.’ He was in great pain, clutching at his clothes, and retching, was evidently dying and realized it. He never expressed any hope. Some one said, ‘Tell as all about it, Mr. Myers.’ This was all before he made any statement.”
The Commonwealth then offered to prove the declarations made by the deceased concerning the circumstances of the shooting, but upon objection made by the appellant, the court refused to allow the evidence to go to the jury.
With a view to obtaih the opinion of this court as to the correctness of that ruling the Commonwealth has prayed a cross-appeal. We do not think a cross-appeal can be granted; but we are of the opinion that it is our duty, when we reverse a judgment on the appeal of one convicted of a crime and remand the case for. a new trial, to settle the whole law of the case as far as we can on the record before us, and that we may, without a cross-appeal, pass upon all questions decided adversely to the Commonwealth, to which proper exceptions have been taken. If the appellant comes to this court to have errors to his prejudice corrected, there would seem to be no reason why those in his favor should not be corrected also, so that on another trial the law may be correctly applied to the whole case.
The general principle upon which dying declarations are admitted was stated by Lord Chief Baron Eyre to be this, *259 that they are declarations made in extremity, when the party is at the point of death, and when every hope of this world is gone; when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth.
The evidence shows that Myers died in twenty or thirty minutes after he was shot; he declared he must die, and when a hope that he might get better was expressed to him, he repeated his declaration. He was in the very article of death, and knew it, and his declarations were admissible, unless they were in themselves incompetent or irrelevant.
The court heard the statement of the witness (not in the hearing of the jury) and it is embodied in the record, and is as follows: “ He followed me to my office armed, and insulted me about sonqe questions I had asked. I was sitting at my desk writing when he insulted me grossly. I ordered him to leave the room, but he refused to go. I then undertook to put him out, when he drew his pistol and tried to shoot me. I tried to prevent him. He got the advantage of me and shot me in the abdomen.”
The statement that the appellant followed him to his office may not be competent, because it does not relate to the act of killing or the circumstances immediately attending it. (Lieber v. Commonwealth, 9 Bush, 11.) But the statement that “he” insulted me about questions I had asked, and all following that, related to the circumstances immediately attending the killing, and the whole should have been admitted, omitting only the words “ followed me to my office armed.” The statement that the appellant insulted him can not be excluded as the mere opinion of the declarant. It was the statement of a fact.
Judgment reversed, and cause remanded for a new trial upon principles not inconsistent with this opinion.
*260 L
*261 DECISIONS OR THE COURT OF APPEALS OF KENTUCKY. SEPTEMBER TERM, 1877.

But see Conner v. Commonwealth, post 714.