## Martin v. Commonwealth.

(Decided December 21, 1917.)

### Appeal from Calloway Circuit Court.

1. Homicide—Dying Declarations—Competency.—It is essential to the competency of the dying declaration of a victim of a homicide, as evidence, of who was the perpetrator of the homicide, and the manner of its doing, that, at the time, the declaration was made, he was then under the belief that death was impending and his dissolution near, and when he had given up all hope of recovery.

2. Homicide—Dying Declarations—Self Serving Declarations.—Declarations of one, who is accused of a homicide, made before the tragedy, as to the relations between him and his victim, and not in the presence of the victim, are self serving, and are not competent evidence, in his behalf, upon the trial.

3. Criminal Law—Threats—Evidence.—Where one speaks a threat indirectly or by innuendo, but where all the circumstances show to whom the threat refers, it is provable against the utterer.

4. Homicide—Clothing Worn by Deceased—Evidence.—The clothing worn by the victim of a homicide is not admissible, as evidence, against one accused of his murder, unless it is first proven that the clothes offered are the same as worn by the deceased at the time he received the fatal wounds, and are in the same condition as then, but, their admission, without proof of their unchanged condition, is not prejudicial, unless it appears, that some improper use of them was made, or they had been changed, which was prejudicial to the accused.

5. Criminal Law—Appeal and Error.—It is not a reversible error to refuse to allow a witness to answer a question, where there is no avowal of what answer the witness would make, if permitted to do so.

6. Criminal Law—Threats—Evidence.—Where the issue, in the trial of one for a felonious homicide, is, whether the accused or deceased began the encounter, threats of violence made by the deceased against the accused are provable, whether they have or have not been communicated to the accused previous to the homicide.

7. Criminal Law—Self Defense—Evidence.—Upon the trial of one accused of a felonious homicide, especially, where the defense is

self defense, the relations of the parties to each other is always competent, as evidence, and relevant, and the relations may be shown by proof of previous quarrels and hostile acts, but, the details of previous quarrels and acts are not ordinarily provable for that purpose.

8. Criminal Law—Hostile Acts and Quarrels—Evidence.—For the purpose of proving, whether an unfriendly or revengeful spirit is borne by one party to a homicide against the other, when sufficient latitude is allowed, in the proof of the circumstances of hostile acts and quarrels, to show the animus of the parties, and to what extent, one of the participants may reasonably be apprehensive of danger, at the hands of his adversary, the purpose of the evidence is accomplished.

9. Criminal Law—Evidence—Prejudicial Error.—The rejection of evidence offered by a defendant, which is merely technically competent and relevant, is not a ground for reversal of the judgment of conviction, but the rejected evidence must, also, have been important for the defendant, and its rejection such as amounts to a prejudice to his substantial rights, in view of the entire case, as presented.

10. Appeal and Error.—The Court of Appeals is a court of review, and upon appeals, its duty is restricted to the determination of the soundness and correctness of the decisions and actions of the tribunals of original jurisdiction, from whose judgments appeals are prosecuted, and the correctness of the judgments is determined from the records made in the courts of original jurisdiction.

11. Criminal Law—Change of Venue in Felony Case.—The circuit court can not order a change of venue for the trial of a felony, unless one or the other of the parties desires it, and makes a motion or files a petition therefor; nor can the Court of Appeals reverse a judgment, because a change of venue was not ordered, when the defendant did not seek it in the trial court.

J. P. HOLT, A. D. THOMPSON and BENNETT N. YOUNG for appellant.

M. M. LOGAN, Attorney General, and OVERTON S. HOGAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE HURT—Affirming.

On the 9th day of December, 1916, the appellant, Lube Martin, with a pistol, shot and mortally wounded Guthrie Diuguid, in Curd street, in the town of Murray, in Calloway county. The shooting took place at about twelve o'clock, on Saturday, and the wounded man died on the following day, at about 4:30 p. m. At the time of his death, Diuguid was a deputy constable, and pre-

vious to that time, it seems, had been a deputy marshal
of the town of Murray, and for several days, previous
to the shooting, he had been employed, in superintend-
ing the labors of certain prisoners in the county jail,
who had been adjudged to work at hard labor upon the
roads, in satisfaction of their fines, and on the morning
of the day, upon which he was shot, the judge of the
county court had requested him, over the telephone, to
come to the court house, for the purpose of receiving
instructions, in regard to the working of the prisoners,
and as he was proceeding from his home, along the side-
walk, upon the east side of Curd street, going in the di-
rection of the county court house, he was met by the
appellant, Lube Martin, who was accompanied by his
brothers, Sylvester Martin and "Ann" Martin, and one
Ed Jordan. Upon their meeting with Diuguid, the
shooting took place, which resulted in his death on the
following day. Two bullets penetrated the body, one
entering his body upon the right side, an inch and one-
half below the nipple, and a half inch from a direct line
through the nipple, and striking a rib, took a downward
course, and lodged in the body, three inches below its
entrance and about five inches from the back bone, from
which place, the bullet was removed by the surgeon.
The other bullet penetrated his left shoulder, directly
upon its top, and taking a downward course, in the opin-
ion of the surgeon, lodged somewhere near the base of
his heart, as the surgeon, after his death, following the
course of the bullet with a probe, from its entrance, at
the top of his shoulder, down to the point, where the
second rib attaches to the breast bone. Diuguid was a
white man, about fifty years of age, and the appellant is
a colored man, about thirty-two years of age. The theory
of the prosecution is, that, when the appellant and his
brothers and Jordan met with Diuguid, an alterca-
tion started between them, when Sylvester and "Ann"
Martin seized Diuguid and were holding him, when the
appellant shot him, with his pistol. The theory of the
prosecution is supported by the dying declaration of the
deceased, which was to the effect, that "Ann" and
Sylvester Martin were holding and beating him, and
while they were so engaged, the appellant fired the fatal
shot. A lady testified, that she saw the parties from
her door when they met, and as soon as they met, about
three of the colored men seized Diuguid, and "they

tussled around there a few minutes, and Diuguid jerked loose and walked on two or three steps, when they huddled around him and commenced shooting,'' and after four or five shots were fired, the parties, attacking Diuguid, ran off and Diuguid then continued in the direction he was pursuing, when he met appellant. Another lady saw the difficulty, after having heard the first two shots, and her testimony was to the effect, that the parties were huddled up and apparently ''scuffling and pushing each other,'' and appellant fired three or four shots after she came to her window, where she could see them. A boy, who resided, in a house, on the opposite side of the street, from where the altercation took place, testified to having seen Diuguid and the other parties standing near to each other, and apparently talking, when the appellant drew a pistol and fired four shots at Diuguid, when the witness turned away and two more shots were fired, thereafter, and that just as appellant drew his pistol, Diuguid stepped back from him and the three parties with appellant, at the same time, stepped off the sidewalk and came across to the other side of the street. The evidence, as a whole, is somewhat conflicting, as to what transpired, when Diuguid and appellant met upon the sidewalk, arising in part from the fact, that the attention of the witnesses was attracted to the difficulty, at different periods of its continuance, and hence, some of them detail circumstances, which others do not. The evidence introduced by the prosecution shows, without very much doubt, that six shots were fired, and that all of them were fired by appellant. The proof for the prosecution, also, shows, that while the deceased, at least, at the time the rencounter ended, had a pistol in his hand, but, there is no witness for either the Commonwealth or for the appellant, who undertakes to say, that Diuguid's pistol was discharged, and it is proven, without contradiction, by several witnesses, that after the altercation, that there were six loaded cartridges in the pistol, which Diuguid had, and which was the number, which it would contain, and that neither one of them showed any evidence of an attempt having been made to discharge the pistol, and furthermore, that from the time the appellant ceased to fire upon Diuguid and ran, the pistol was not unbreeched or reloaded, and such of the witnesses for the prosecution, who saw the pistol, in

his hand, while he was being fired upon, prove that it
was not visible, until after the appellant had commenced
to shoot, and one of the witnesses describes Diuguid,
while the shooting was being done by the appellant, as
standing with his pistol hanging down in his hand. The
Commonwealth's attorney, also, proved by two or three
witnesses, that prior to the shooting of Diuguid,
appellant had made threats, that he would kill or harm
him, and to one witness, exhibited a shot gun, with
which he said, that he intended to shoot Diuguid, and
that certain parties had told him to shoot him.

The theory of the defense is, that Diuguid bore a
deadly animosity against the appellant, and had on a
number of occasions threatened to take his life, and had
assaulted him with a pistol, and, furthermore, had
claimed that appellant had been attempting to kill him,
and had made a charge of some kind against him before
the town council, and on account of which, he threat-
ened, that the appellant should not be permitted to live
or stay in Murray, unless he withdrew the charge
against him. Appellant, furthermore, claims, that being
afraid of Diuguid, he left the town of Murray, in March,
and went to the state of Tennessee, where he remained,
until the time Diuguid was killed, and that such occasion
was the fourth time, that he had been in the town of
Murray, since in the month of March; that he returned
in June and in September, and on another occasion, the
time of which is not given, but, on these occasions, that
he avoided meeting with Diuguid, and would leave as
quickly as possible, and that he came to Murray on
account of being sick, on Wednesday previous to the
altercation on Saturday, and that at the time of the
shooting, that he and his brothers and Jordan were go-
ing from the house of a relative to their father's house
for the purpose of taking dinner, and that upon meeting
with Diuguid, Diuguid said, "Lube, I thought I told
you to come up yonder," and that appellant answered,
"I had to go off, but I will go with you now or any time
you want me to," and that in reply to that, Diuguid
answered with an oath, and said, "You don't have to
go anywhere, but I will fix you right now," and im-
mediately drew his revolver, when appellant, for the
purpose of saving his life, drew his pistol and began to
shoot at Diuguid, and after having shot four times, that
he fled and, immediately, leaving the town, took to the

woods, and proceeded into the state of Tennessee, where he was, thereafter, apprehended. It is claimed by the defense, also, that neither appellant, nor any of those with him, took hold of Diuguid or attempted to do so, but instead, when the pistols were drawn, or previous thereto, ran to the other side of the street and fled. "Ann" Martin and Sylvester Martin corroborated the appellant, as to what transpired up to that time, when they stated, that the deceased said, "that he would fix" the appellant and thrust his right hand toward his left side, changing his walking cane from his right hand into his left, when they immediately ran to the other side of the street and did not see a weapon in the hand of either Diuguid or appellant, and did not see any one shoot, and appellant only says, that he thought, that Diuguid shot. Ed Jordan, who was one of the party, gives the following version of the affair: He states that when appellant and "Ann" and Sylvester Martin and he met Diuguid, the appellant passed him a few feet, when Diuguid, turning partially around and resting with both hands upon his walking cane, said to appellant, in substance, "I thought I told you to come up to the council," and that appellant replied, "that he had to go off; but that he would go with him now," and immediately drew his pistol and commenced to shoot; that Diuguid, at that time, did not have a weapon drawn, nor had made any attempt to draw a pistol, when Jordan, also, ran to the other side of the street.

The appellant was indicted and charged with the crime of wilful murder, and upon a trial was found guilty by the jury, as charged in the indictment, and the penalty fixed at death. The court thereupon entered a judgment in accordance with the verdict. The appellant filed grounds and moved the court to set aside the verdict of the jury and judgment of the court, and to grant him a new trial. This motion was overruled, and hence the appeal to this court.

The grounds relied upon for a reversal are: (1) The court erred in the admission of incompetent evidence, prejudicial to the appellant; (2) the court erred in excluding from the consideration of the jury evidence offered by the appellant; (3) the court erred in overruling the demurrer to the indictment; (4) the court erred in instructing the jury and refusing to properly instruct the jury; (5) the verdict of the jury is against the evi-

dence; (6) the verdict is against the law; and, (7) the verdict is not sustained by either the law or the evidence.

(a) The 3rd, 4th, 5th, 6th, and 7th grounds seem to be merely formal, as no criticism is made of the indictment, and no defect in it is observable. The instructions seem to be as favorable to the appellant as he was entitled to have, and substantially present all the issues of the cause for decision by the jury, and no failure is observable, to properly protect all the rights of the appellant, in the instructions given by the court to the jury. The instructions defining the crime of wilful murder and defining the crime of voluntary manslaughter are the usual ones given in such cases. The third instruction advises the jury, that if it believes, beyond a reasonable doubt, that the accused is proven to be guilty of either wilful murder or voluntary manslaughter, but has a reasonable doubt of which offense, he is proven guilty, it should find him guilty of the lesser offense, that of voluntary manslaughter. The fourth instruction, in substance, directs the jury, that, although, it may believe, beyond a reasonable doubt, that the accused did shoot and kill the deceased, yet, if it believes from the evidence, that at the time, he did so, he had reasonable grounds to believe and did in good faith believe, that he was in danger of losing his life or suffering great bodily harm, at the hands of the deceased, whether the danger was real or to the accused apparent, that the accused had a right to use such force as was necessary, or to him appeared to be necessary, to protect his life or person from bodily harm at the hands of the deceased, and if the jury believed that the accused used no more force than was necessary or to him appeared to be necessary, for the purpose of protecting his life and person, it should find him not guilty, upon the ground of self-defense. By a fifth instruction, the jury was advised that it could not convict the accused upon the testimony of Ed Jordan, alone, but there must be other corroborating evidence, which tended to establish the guilt of the accused, and this instruction seems to be more favorable to the accused than he was entitled to, as there was no evidence of the fact that Jordan was an accessory to the crime of which the appellant was accused. By a sixth instruction, the jury was advised, that the law presumed the accused to

be innocent until proven to be guilty, beyond a reasonable doubt, and, if, upon the whole case, it had a reasonable doubt of his having been proven to be guilty, it should find him not guilty. No attempt is made by counsel to point out anything in support of the three last grounds for a new trial, as the evidence was amply sufficient to support the verdict, and under such circumstances, as a matter of course, it could not be said, that it was contrary to the evidence or contrary to the law.

(b) It is, however, seriously insisted, that the court erred in admitting, in the evidence, over appellant's objection, the alleged dying declaration of the deceased. This declaration, as testified to, was, "They had hold of me, and was beating me and Lube shot me," and the further statement, that Sylvester Martin and "Ann" Martin were the parties, whom the deceased said had hold of him, and were beating him, when the accused shot him. It is not insisted, that the statements made by the deceased, in regard to whom, it was, that shot him and the manner in which he was shot and killed, are not competent evidence, if the deceased, at the time he made the declarations, had such consciousness of impending death and immediate dissolution, as would put him in that frame of mind, in which the law requires the wounded person to be, before his declaration can be accepted as evidence, without the solemnity of an oath, and the privilege of cross-examination. It is, however, seriously insisted, that the facts, as proven, did not justify the court in arriving at the conclusion, that the deceased, when he made the declaration, was then under the belief of impending dissolution, and had given up all hope of recovery. The evidence discloses, that the deceased was wounded about noon on Saturday, and immediately requested the driver of a wagon, who was nearby, to take him, in the wagon, to the office of a physician, which was done; and upon his arrival at the office of the physician, the deceased was suffering from the wounds to such an extent, that the physician administered an opiate to ease the suffering. Deceased was then removed to a nearby hospital, where he died on the following afternoon, at half after four o'clock. He was wounded, as heretofore described. The surgeon was of the opinion, that one of the bullets extended its course from the top of his left shoulder to about the base of his heart, and that his condition was very ser-

ious, though the surgeon did not tell the deceased of the seriousness of his condition, but made no effort to conceal it from him. As soon as the wife of deceased arrived at the hospital, which was shortly after he was taken there, he expressed a conviction, that he would die from the effects of the wounds, and never expressed any other conviction, as long as he lived, but all of his expressions were to the effect, that he would not recover. He, at no time, ever expressed any hope of recovery. His condition was regarded, as so serious, that no one expressed any hope or belief to him, that he would recover. He made the declaration about noon on Sunday, and within an hour or two, thereafter, expressed a desire to see his children before he died, and thereafter died, as above stated. The authorities do not differ as to what is the chief essential element to make a dying statement competent evidence, as to the identity of the perpetrator of a homicide and the facts pertaining to its commission. The party, whose declaration is offered, must have been, at the time, the declaration was made, under the solemn belief, that death was impending and dissolution near at hand, from the effect of his injuries, and, when he had given up all hope or expectation of escape from death. The party need not declare, in express words, that he knows that he is about to die, or words equivalent to such expression, but the court may determine whether the party, at the time, the offered declaration is made, has given up all hope of recovery and is conscious of impending dissolution, from all the attending circumstances, including the evident seriousness of the injury. Alsop v. Commonwealth, 164 Ky. 171; Arnett v. Commonwealth, 114 Ky. 593; Eversole v. Commonwealth, 157 Ky. 478; Peoples v. Commonwealth, 87 Ky. 487; Daniel v. Commonwealth, 154 Ky. 601; Terrill v. Commonwealth, 13 Bush 246; Baker. v. Commonwealth, 106 Ky. 212; Begley v. Commonwealth, 154 Ky. 30; Pennington v. Commonwealth, 24 R. 321; Postell v. Commonwealth, 174 Ky. 272; Cavanaugh v. Commonwealth, 172 Ky. 799; Allen v. Commonwealth, 168 Ky. 325; Matherly v. Commonwealth, 97 Ky. 193; Commonwealth v. Johnson, 158 Ky. 582. In the instant case, the deceased expressed the conviction shortly after the wounds were received, that he was going to die from them and did not, at any time, express any hope of recovery and did shortly die, and it

can be reasonably inferred from the seriousness of the wounds and his suffering, that he was conscious, that death was near at hand. Hence, the admission of the declaration as evidence was not error.

(c.) The appellant, on the trial, offered to prove, by Dr. Mason, Suddie Brooks, Robert Foster and Dr. Keys, certain statements, which he had made to them prior to the death of Diuguid, to the effect, that he did not live in Murray, and was residing in Tennessee, because of fear of deceased doing him injury, and that deceased had threatened to take his life, and the court excluded the offered testimony and of this appellant complains. These statements were not made in the presence of deceased, and were clearly self-serving declarations, which are not admissible as evidence upon any ground known to the law. The same may be said of the alleged statements of the appellant, which were offered to be proven by Judge Langston. To admit such declarations as these, as evidence, would be to enable the person to manufacture a defense for himself, which had no real basis, in fact, as the declarations offered to be proven were all made, at a time, when there was no interested party able or had opportunity to controvert them. 21 Cyc. 971; 12 Cyc. 426; Walling v. Commonwealth, 18 R. 812; 38 S. W. 429.

(d.) After proving that a letter had been written to him by his mother prior to the homicide, the appellant offered the letter in evidence, and upon objection, it was excluded. The ground upon which it is insisted, that the letter should have been admitted, as evidence, is, that it communicated a threat, which deceased had made against the life of appellant. An examination of the letter, however, shows, that it did not contain a statement to the effect, that the deceased, Diuguid, had made any threat against appellant. The evidence does not disclose, that appellant's mother ever had any information to the effect, that Diuguid had made a threat of any kind against the appellant, and hence, it can not be assumed that the party to whom the letter makes reference, as having made a threat of violence against the accused, was the deceased, Diuguid. A threat made by some one, other than deceased, and communicated to accused, would not be any ground for the accused apprehending danger from the deceased. The letter refers to the party, who made the threat as that "old man." This

is not a state of case, where one utters a threat indirectly or by innuendo, but where all the circumstances show to whom the threat refers. In such state of case, the threat may be proven as evidence against the utterer. McCandless, v. Commonwealth, 170 Ky. 314; Sparks v. Commonwealth, 89 Ky. 644; Young v. Commonwealth, 19 R. 927. The circumstances of this case do not justify the conclusion, that the deceased was the "old man" referred to in the letter, as it might have reasonably been another as the deceased. Such a communication to the accused in the absence of any other fact connecting the deceased with the threat, would not have justified the accused, in concluding, that it was the deceased. The letter only purported to communicate a threat, without indicating, who was the maker of the threat, and was not evidence of a threat having been made.

(e.) The clothing worn by the deceased, at the time he was shot and wounded, was admitted as evidence, over the objection of the accused. The record shows, that the clothing was admitted, upon proof, by the daughter of the deceased, that they were the same worn by deceased, at the time he was shot by the accused. The bill of exceptions contains no further information in regard to the clothing, and the bare fact is presented, that they were admitted. There is nothing before us to show for what purpose the clothing was used on the trial, if at all, or what they conduced to prove. It can be assumed, that the clothing showed, where the bullets penetrated the body of the deceased, and if they failed to show the location of the wounds clearly, or were used for any other purpose or were in a changed condition, there is no showing of such facts, if they were facts. If the Commonwealth's attorney made use of them, in his argument, in an improper way, or argued that they proved things, which were not facts, there was no objection made, and neither was the bill of exceptions made to show such improper use of them or any use, at all. The clothing worn by the victim of a homicide, when he is found dead, or when he received the mortal wounds, may properly be shown, as evidence, to shed whatever light they may upon the cause and manner of his death, if they tend to show such facts, but it is error to permit their introduction, as evidence until it is shown that they are in the same condition as when the

deceased received his mortal wounds, that is unchanged, or if the deceased is found dead, that the clothing is in the same condition as then. McCandless v. Commonwealth, 170 Ky. 308. In the instant case, however, the error in admitting the clothing, without proof, that they were in the same condition as when deceased received the wounds, for the reasons above stated, must be held to have been harmless, in the absence of a showing that their introduction was in any way prejudicial to the accused.

(f.) During the examination of the appellant, as a witness for himself, in chief, he was asked if Henry Pool ever told him anything about Diuguid making a threat against him. Upon objection, the court refused to permit the witness to answer, and this is complained of as error. There was no avowal made, as to what answer the appellant would give, if permitted to do so. Hence, it can not be held, that the refusal to permit him to answer the question was prejudicial. The time to which the question related was not confined to a time, previous to the shooting of Diuguid, which was probably the ground of the court's ruling. Henry Pool was called as a witness for appellant, and while he testified to having heard the deceased utter a threat against the appellant, he stated that he never, at any time, communicated it to appellant.

(g.) Appellant was, also, asked, upon his direct examination, if his father, Alex Martin, had, during the months of March or April, 1916, communicated to him a threat against his life made by the deceased. This was objected to and the court sustained the objection. An avowal was made, that, if permitted to answer, the appellant would state, that Alex Martin came to him about the time mentioned and said to him, that the deceased had said to him (Alex Martin) that he (deceased) expected to kill appellant, "unless he came up and straightened out those matters between them." Just previous to the asking of the above question, the appellant had stated, that in the latter part of the month of March, his father had communicated a threat made against him by the deceased, and the ruling of the court was, doubtless, based upon the idea, that the question and proposed answer thereto were only a reiteration of what had already been asked and answered. Technically, the ruling of the court was error, but it could, in

no wise, have been prejudicial, since Alex Martin was thereafter called as a witness, and testified to three threats, which he stated, that the deceased had made in his presence, at different times, against the accused, and further, stated, that he communicated all of them to the accused, in the language used by the deceased, before the time of the trouble, in which the accused shot and killed the deceased. It will, however, be observed, that Alex Martin testified, that the first time, he heard deceased threaten accused, was about "roasten ear time," in 1916, and the other threats he heard, thereafter, and that he communicated the threats to appellant, in the fall of the year, and hence, if his statement is correct, as to the time he heard and communicated the threats, the appellant was mistaken in stating, that a threat was communicated to him, in either March or April, by his father. If, however, the threats were such as to justify him in apprehending danger at the hands of Diuguid, he knew of them before, he, as he insists, was compelled to shoot and kill him, and received the benefit of the proof of them before the jury.

(h.) It is, also, insisted, that the court erred to appellant's prejudice in a ruling made by it, in reference to the introduction of threats of violence alleged to have been made by deceased, against the life of appellant, and applying to all such threats, to the effect, that the appellant would be permitted to testify to the fact of the threats having been communicated to him, but that he would not be permitted to testify, as to what the threats were, or in other words, could not state what the parties, communicating with him, said to him, that the deceased had said concerning him, until it was first proven, that the deceased had made the threats, which were communicated. The decision of this question is, however, unnecessary, as its discussion, in the light of the facts presented by the record, would be merely academic. While appellant stated, that threats, made by deceased against him, were communicated to him by different persons, before the tragedy, he does not name, nor attempt to name, any person, who communicated to him a threat against him, except his father, Alex Martin. He does not pretend or show by anything, in the record, or otherwise, that any person ever communicated a threat to him, except his father, or that any witness was in existence anywhere, or then dead, who heard a threat

from the deceased, or had heard such threat and communicated it to him, and who was not present and testified upon the trial. Alex Martin and Clarence Martin testified to having heard the deceased make threats against the life of the accused, and they stated to the jury the language, which they said the deceased made use of in reference to the accused, and stated, that thereafter and before the tragedy, they communicated to the accused, exactly what the deceased had said. Henry Pool, the uncle by marriage, and Chester Martin the brother of the appellant, testified to having heard the deceased make threats of violence against the life of the accused, but that they did not communicate same to him. They were permitted to state to the jury all that the deceased had said, and Henry Pool was permitted to testify, that he communicated the threat heard by him to the wife of appellant, but appellant does not state or pretend, that his wife ever communicated the threat to him. The affidavit of appellant, as to what Neal Williams, a witness, of whose whereabouts the appellant did not know, at the time of the trial, would testify, was permitted to be read as the deposition of Williams. Williams testified to threats, which he stated that he heard the deceased make to the accused. Thus, it seems that the accused received the entire benefit, and to the fullest extent, upon the trial, of all the threats, which he claims were made against his person or life, by the deceased, and which were heard by any other person, and he, also, received the benefit, upon the trial, of having, at the time of the tragedy, knowledge of such of the alleged threats as were communicated to him. The issue, in this case being, as to whether the accused or deceased began the fight, in which deceased lost his life, the court properly admitted proof of all the threats made by deceased against the accused, whether they had or had not been communicated to the accused before the difficulty. Young v. Commonwealth, 19 R. 927; Hart v. Commonwealth, 85 Ky. 77; Miller v. Commonwealth, 89 Ky. 653; McCandless v. Commonwealth, 170 Ky. 314; 13 R. C. L. 923; 21 Cyc. 967.

(i.) Two further rulings of the court are complained of, with reference to the rejection of testimony offered by the appellant, when testifying in his own behalf. One of them relates to the exclusion of the

testimony of appellant with relation to the details of the trouble or altercation between deceased and appellant, in the latter part of the month of March, about eight months previous to the homicide. In cases of homicide, especially, where the defense is, that the slaying was done in self-defense, proof of the relations of the parties to each other is always competent and ordinarily relevant. The purpose of such evidence is to show, whether the relations of the parties is unfriendly or otherwise, so as to enable the jury to properly comprehend and give due weight to the acts of the parties. For this purpose, hostile acts and quarrels, where the plea is self-defense, are provable to show, that an unfriendly and revengeful spirit may exist in the mind of one toward the other. When latitude, in the statements pertaining to such hostile acts and quarrels, is sufficient, to show the animus and the extent of it, so as to make it apparent, to what extent one of the participants may be apprehensive of danger, at the hands of the other, the purpose of the testimony has been accomplished, and ordinarily, the details of previous quarrels and altercations between the parties are not admissible. With reference to what transpired on the occasion in March, the appellant was permitted to testify, that the deceased accused him of having threatened to kill him, and that deceased then said to him, that "he would kill him (appellant) if it was the last thing he ever did on earth." The appellant, also, stated, that he had never uttered an unfriendly expression against the deceased. The appellant further testified, that two or three days after the occurrence in March, deceased said to him, "Lube, you threatened my life, and I am going to kill you tonight, if you don't come up there to the council. I am going to do that thing, if it is the last thing I do. I am going to kill you if my gun will shoot." He further testified, that on the same day he casually met with the deceased, who "drawed his pistol up," and appellant went into a furnace, at the bank, where he was working, and remained there and at a physician's office during the remainder of the day, and on the following day his father communicated a threat to him, which deceased had made against him, and that on the day following the communication of the threat to him, that he left the town and did not return, until in the month of June. The appellant, further testified, that on the 21st day of September, he met with deceased, who drew his pistol upon him and

said, "Stop, I am going to kill you, you black son a bitch. I have been looking for you all this year and you have been gone. Where you been? Come on up to the office with me," and I said, "Mr. Diuguid, wait until morning and I will go there with you, and he said, 'No, you black son of a bitch, you will go now or I will take the top of your head off,' and I walked on with him." "When we were going up there, he said, 'Lube, you black son of a bitch, I am of a great mind to kill you now, but I am going to spare you one more time, but I am going to kill you if it is the last thing I do.'" The appellant then stated that he protested that he had not done anything to the deceased, who said, "That is all right, I am going to kill you." The appellant was then asked, if deceased gave any reason for wanting to kill him at that time. This question was objected to, and the court sustained the objection. It was then avowed, that he would answer, that the deceased said, "You have made affidavit against me about being intimate with your wife, and if you don't go up there and take it back before the council, I am going to kill you." This, while a conditional threat, was competent evidence, and the appellant should have been permitted to answer it, and the ruling of the court must have resulted from some inadvertence, as the appellant was permitted, thereafter, to state, that he had never made any such charge against deceased. The testimony of Neal Williams, as contained in the affidavit, which was read as the deposition of Williams, was to the effect, that the deceased made the statement, regarding the affidavit, to appellant in his presence, and Williams' testimony is not controverted. The threat proved by Henry Pool was, in substance, that appellant had made evidence against deceased, which he must remove, if he was permitted to remain in Murray. Hence, the question arises, whether on account of the error above stated, the judgment of the court should be reversed. We must necessarily apply to this case the same principles, which are applied, in passing upon appeals from judgments of conviction, in all other felony trials, although the penalty, in the instant case, is the severest one, which the law permits, and naturally imposes a strong and earnest degree of caution. It is a matter of common knowledge, that few cases are tried, in which there is not an error, great or small, made by either the court or jury, and section 340, of the Criminal Code, was adopted to prevent the necessity of a reversal of a judgment, in a crim-

inal case, for a trivial error, or one which does not prejudice the substantial rights of the accused. The section is as follows:

"A judgment of conviction shall be reversed for any error of law appearing on the record, when, upon consideration of the whole case, the court is satisfied that the substantial rights of the defendant have been prejudiced thereby."

In Arnett v. Com., 156 Ky. 803, it was said:

"Few cases are tried without the commission of some error on the part of the court or jury, but section 340, Criminal Code, only authorizes a reversal for an error of law appearing in the record, if, upon consideration of the whole case, the court is satisfied, that the substantial rights of the accused have been prejudiced thereby."

In Cavanaugh v. Com., 172 Ky. 807, it was said:

"To authorize the reversal of a judgment of a conviction of felony upon the ground of rejection of evidence offered on the part of the defendant, it is not sufficient, that the rejected evidence be shown to have been merely pertinent or relevant or technically admissible. It must always be important for the defendant, in view of the whole case, as presented."

To the same effect are Champ v. Com., 2 Met. 16; Collett v. Com., 121 S. W. 426; Hargiss v. Com.,135 Ky. 578; Reed v. Com., 138 Ky. 568; Parrish v. Com., 136 Ky. 77. It is impossible to see, when the number of threats are considered, which appellant testified, that the deceased made to him, how the failure to admit the one rejected, could be important to his defense, or that it would, in anywise, have caused a different result of the trial, and especially, when the rejected threat was proved by other uncontroverted testimony, that it was made by deceased to appellant. The evidence, if believed, was abundantly sufficient to have caused the belief that appellant had reasonable grounds for apprehending danger at the hands of the deceased, and the only apparent reason for its rejection by the jury, which is the judge of the credibility of the witness, is, that the jury, in its province as the trier of the facts, disbelieved the testimony offered for appellant, when weighed against the evidence offered for the Commonwealth. The evidence was abundantly sufficient to sustain the verdict, and we cannot invade the province of the jury to hold, that a different verdict should have been rendered. Hence, there seems to be no error of law appearing upon the record, which was prejudicial to appellant's substantial rights.

(j)   The argument offered, that the judgment should be reversed, because of newspaper reports, which would indicate such a bitter state of feeling in the county of Calloway, against the appellant, that he was prevented from having a fair trial, and that, for such reason, the judgment should be reversed and a change of venue ordered by this court cannot be accepted.   This court is a court of review, and upon appeals, it is restricted to the duty of determining the soundness and correctness of the decisions and actions of the tribunals of original jurisdiction, from whose judgments appeals are prosecuted.   The record does not disclose, that any motion was made or petition filed for a change of venue, in the trial court, and without such the trial court was powerless to order a change of venue, and such question cannot be before this court for review, as neither the trial court nor this court could order a change of venue, in a criminal prosecution, when it is not desired nor sought by one or the other of the parties.   The record shows, that in place of asking for a change of venue, the appellant moved the court to order a jury brought from the county of Christian to try him, which motion was acceded to, and the jury, which tried him, was summoned and impanelled out of the citizens of the county of Christian, which is not an adjoining county to that in which the action was tried, and no fact is shown or relied upon, in the record, which would indicate, that the jury was anything, other than an impartial one.

Hence, the judgment is affirmed.

Whole court sitting.