# Watson Caudill and Kelly Caudill v. Commonwealth.

(Decided December 17, 1926.)

## Appeal from Perry Circuit Court.

1.  Criminal Law—General Motion to Exclude Testimony, Part of which was Competent, Cannot Effect Exclusion of Incompetent Part.—Motion for exclusion of testimony of witness, as a whole

cannot effect exclusion of such part thereof as may have been incompetent, where part of evidence in question was competent.

2. Homicide—Testimony of Defendants' Appearance of Being Drunk 20 Minutes Before Homicide Held Competent.—In murder prosecution, testimony of defendants' conduct 20 minutes before homicide and as to fact that they appeared to be drunk held competent.

3. Criminal Law—Evidence of Juror's Separation for Short Time Held Insufficient to Establish Misconduct of Juror or Officer in Charge.—Affidavit relative to brief separation of one of jurors, found asleep in jury room at meal time, held insufficient to establish alleged misconduct of juror or officer in charge.

4. Criminal Law—Refusal of New Trial for Misconduct of Juror or Officer is not Reversible Error Without Affidavit as to When Information was Obtained.—In absence of affidavit of defendants or counsel as to when information alleging misconduct of officer or juror was obtained, ruling of trial court in refusing new trial on that ground will not be declared reversible error.

5. Criminal Law—Defendant Must Establish by Affidavit that Misconduct of Juror or Officer in Charge was Not Known Until After Verdict, to be Entitled to New Trial.—When misconduct of jury or officer in charge does not become known to defendant until after verdict, it is incumbent on him to establish such fact by affidavit filed in support of motion for new trial.

6. Homicide—Evidence of Defendants' Guilt of Manslaughter Held for Jury.—Evidence of defendants' guilt of voluntary manslaughter held to require submission of case to jury.

7. Criminal Law—Evidence Held to Corroborate Testimony of Defendants' Accomplices.—Evidence, in murder prosecution, held to sufficiently corroborate testimony of defendants' accomplices.

8. Criminal Law—Corroborating Evidence, to be Sufficient, Need Not Authorize Conviction.—Corroborating evidence, to be sufficient, need not of itself authorize conviction, or be equivalent to testimony of eye-witness.

9. Criminal Law—Judgment Will be Reversed, as Against Evidence, Only when Clearly Appearing to be Result of Passion or Prejudice.—Judgment will be reversed, as being flagrantly against evidence, only when it appears that it was so much against weight of evidence as to shock conscience and clearly appear as result of passion or prejudice on part of jury.

10. Criminal Law—Jurors are Sole Judges of Facts and of Credibility of Witnesses.—Jurors are sole judges of facts and credibility of witnesses, as well as of effect to be given all facts and circumstances in evidence.

JESSE MORGAN, F. J. EVERSOLE and J. T. BOWLING for appellants.

FRANK E. DAUGHERTY, Attorney General, and CHAS. F. CREAL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

On April 21, 1925, one Tom Berry, was shot and killed near Christopher, a railroad station in Perry county, this state, and on the following day, April 22, 1925, Watson Caudill, Kelly Caudill, Austin Godsey and Beech Davis were jointly indicted by the grand jury of Perry county for the killing of Berry; the crime charged in the indictment against each of them being that of murder.

The indictment contained five counts, in the first of which the four named defendants were, jointly and severally, substantially charged with entering into a conspiracy to murder the deceased, and that in pursuance of such conspiracy they did shoot and kill him; and in one of each of the remaining four counts one of the defendants was charged as principal and the other three as aiders and abettors in the commission of the crime. The joint trial of Watson Caudill and Kelly Caudill under this indictment resulted in a verdict of the jury finding each of them guilty of voluntary manslaughter and the fixing of the punishment of each at confinement of two years in the penitentiary, and each has appealed from the judgment entered by the trial court in approval of the verdict.

It appears from the record before us that Austin Godsey's trial, which was the first that occurred under the indictment, resulted, as did that of the appellants, Watson and Kelly Caudill, in a verdict and judgment finding him guilty of voluntary manslaughter, and the fixing of his punishment at confinement of two years in the penitentiary. The record also shows that Beech Davis, the fourth person accused in the indictment, was at the same term of the court the appellants were tried, in default of bail, remanded to jail and his case set down for trial on the 27th day of the term. But we are not advised by the record whether he was then or later tried for the crime charged or, if not, what disposition, if any, has been made of the prosecution as to him.

The reversal of the judgment appealed from is asked by the appellants because of error alleged to have been committed by the trial court in the following particulars: (1) In admitting on the trial incompetent evidence in behalf of the Commonwealth. (2) Misconduct

of the jury and a deputy sheriff in charge of the jury, in permitting them to become separated during the trial. (3) That the verdict was unsupported by and flagrantly against the evidence, and resulted from passion or prejudice on the part of the jury. (4) That the evidence of the accomplices was uncorroborated.

The evidence complained of as incompetent was furnished by the testimony of Abe Newberry and Martha Sams, witnesses for the Commonwealth, that of Newberry being substantially to the effect that, twenty minutes before the killing of Berry, he, while standing in front of his father's home and but a short distance from the place of the homicide, saw Austin Godsey, Beech Davis and the appellants, Watson and Kelly Caudill, all of whom were well known to him, walking together down the railroad track toward Christopher. That all of them talked and acted like they were drunk; and when they got to a point near the witness they met two negro men that were also walking on the railroad track, at which meeting the appellant, Watson Caudill, after cursing the negroes and applying to them a vile epithet, demanded that they give him a nickel; and upon being told by them they did not have it, he picked up a rock and hit one of them on the head with it. That Austin Godsey then jerked out his gun and told the negroes "not to fool about going," and when the latter started to run Beach Davis threw one rock at them which failed to strike either of the negroes.

At this juncture the witness saw the appellant Kelly Caudill at the cattle gap engaged in striking one of negroes in the back with a rock.

The witness Martha Sams testified, in substance, that she knew Watson Caudill and Austin Godsey, but was unacquainted with Kelly Caudill or Beach Davis, and that on the day Tom Berry was killed and in her opinion not exceeding thirty minutes before the occurrence of that event, she, while hunting her cow near the residence of Ben Newberry, the father of the witness, Abe Newberry, saw Austin Godsey and Watson Caudill and a third man she did not know, "rocking some colored folks," and they appeared to be drunk.

The appellants did not specifically object to any part of the above related testimony of the witnesses Abe Newberry or Martha Sams. The only objection that came from them while either of these two was testifying, was made to the following question asked Newberry by coun-

sel for the Commonwealth: "Tell the jury if these colored folks were doing anything to them?" The question was never answered by the witness, as the promptness with which the court sustained the objection and excluded the question prevented an answer. The appellants did, however, at the conclusion of the testimony of each of the witnesses named, but without then indicating what part of it was complained of as incompetent, move for the exclusion of the testimony of each as a whole and except to the court's overruling of the motions. But, as we shall presently see, if any part of the evidence in question was competent, the exclusion of such part thereof as may have been incompetent could not be affected through the method of procedure employed by the appellants. In Lowery v. Commonwealth, 191 Ky. 857, the question we are now considering was thus disposed of:

"The uniform and unvarying rule as announced and adhered to by this court is that for an objection to be available it must be specifically directed to that portion of the testimony which is incompetent, and that to object to evidence as a whole when there is contained in it both competent and incompetent testimony will not be sufficient to authorize this court to reverse the judgment because of the error complained of."

Again in Hall v. Commonwealth, 189 Ky. 72, it is said:

"Since portions of the testimony of eye-witness, Bentley, the whole of which was objected to, was relevant the defendant's objections, if shown by the record to have been made, were insufficient to reach the irrelevant and incompetent portion of the witness' testimony and we are not therefore authorized to sustain this ground." Hoskins v. Comlth., 188 Ky. 80; Dukes v. Comlth., 196 Ky. 60.

While some of the details related by Newberry and Mrs. Sams of the unprovoked attack made by the appellants and their companions, Godsey and Davis, upon the negroes, if separately objected to by the appellant's counsel, should have caused their exclusion by the trial court. It is, we think, equally true that so much of the testimony of the same witnesses as conduced to prove the occurrence of the difficulty referred to; that it was initi-

ated by the two Caudils, Godsey and Davis; that it occurred twenty minutes before the killing of Berry, and substantially in view of the place where he was killed; and that all four of the latter were then drunk, or appeared to be so, was competent. This conclusion is sustained by the well known rule approved by all the authorities, a few of which are quoted or cited below. In Bishop's New Crim. Procedure, vol. 1, section 1126, in discussing the admissibility of such evidence it is said:

> "The intent, knowledge or motive under which the defendant did the act charged against him, not generally admitting of other than circumstantial evidence, may often be aided in the proofs by showing another crime actual or attempted. Then it is permissible."

In Greenleaf on Evidence, vol 3, section 15, the rule is thus stated:

> "In the proof of intention, it is not always necessary that the evidence should apply directly to the particular act with the commission of which the party is charged, for the unlawful intent in the particular case may well be inferred from a similar intent proved to have existed in other transactions done before or after the time. . . . " O'Brien v. Comlth., 115 Ky. 608; Kirby v. Comlth., 206 Ky. 535; Newsome v. Comlth., 204 Ky. 179.

While the facts shown by the evidence in question can hardly be declared a part of the *res gestae,* the transaction thereby developed was so nearly akin to the subsequent conduct of the parties in the part they were shown by the evidence to have played in the killing of Berry, occurring about twenty minutes later, that its consideration by the jury for the purposes stated in the rule, *supra,* was not unauthorized. And, obviously, in view of the course pursued by counsel in the attempt to exclude it, the court's overruling of the objections to same was not error.

The appellants' complaint of misconduct on the part of a member of the trial jury and the deputy sheriff in charge of the jury during the trial was not supported by an affidavit from either of them, or their counsel. The alleged misconduct, as argued by their counsel, arose out of a brief separation on one occasion during the trial of

the appellants, of one of the jurors from the remaining eleven. The only evidence introduced on this point is contained in the affidavit of Boyd Campbell, the deputy sheriff referred to, which appears from the record to have been filed by the appellants following the entering of their motion for a new trial.

The affidavit merely states, in substance, that during the trial of the appellants the jury, with the affiant in charge of them, were lodged and fed at a boarding house, and that on one occasion during the progress of the trial and before the return of a verdict by the jury, he, while with the jury in the room where they were kept, in response to a call to a meal, conducted eleven of the jury to the dining room to partake of it, supposing at the time the entire twelve were with him, but that upon entering the dining room with the eleven, he at once discovered the absence of the twelfth juror, and thereupon immediately went back to the room from which he had conducted the eleven jurors, and there found the missing juror alone and asleep, who, upon being awakened by affiant, immediately returned with him to the dining room, where they rejoined the eleven other jurors a minute after the time of the affiant's departure from the dining room.

Neither by the affidavit of the deputy sheriff, nor otherwise, was it shown that during his and the one juror's brief separation from the other jurors, the former or any of the latter conversed on any subject appertaining to the trial with persons, or any person, not of the jury. Moreover, the affidavit referred to failed to advise the trial court when, or how, the appellants, or their counsel, became informed of the facts attending the temporary separation of the one juror and officer from the others, or that they were not known to them, or their counsel, before the return of the verdict of the jury. Furthermore, it may well be said that the facts stated in the affidavit are insufficient to establish the alleged misconduct on the part of the officer, or juror, complained of by the appellants. But had they sufficiently proved the misconduct, in the absence of an affidavit from them or their counsel, showing when information of such misconduct was obtained by them, or counsel, the ruling of the trial court in refusing a new trial on that ground will not, on appeal, be declared reversible error. The meaning of what we have stated is more elaborately expressed in the

following excerpt from the opinion in Black v. Comlth., 154 Ky. 144:

"When a new trial is asked on the ground that a juror has been guilty of misconduct, the person seeking a new trial on this ground should do so at the earliest moment after he has received information of the misconduct complained of, and should file his affidavit stating when he obtained the information. If the party seeking the new trial on this ground fails to do this, he will be deemed to have waived his right to rely on the misconduct as a ground for a new trial, after there has been a verdict against him. Upon this point we said in Drake v. Drake, 107 Ky. 32: 'It does not appear but that the misconduct of the juror was known to the plaintiffs before the trial closed. If it was, they were bound to make the objection at the time, and not wait till after a verdict against them. Their omission to state that allegation in their motion renders it insufficient. A party should not, with knowledge of misconduct on the part of the jury, conceal it from the court, and take the chance of a verdict in his favor, with the expectation of having it set aside if adverse to him.' " Barnes v. Comlth., 179 Ky. 725; Pierce v. Comlth., 215 Ky. 162.

In Barnes v. Comlth., *supra,* which was an appeal from a judgment convicting the appellant of murder, following an exhaustive discussion of the subject here under consideration, we reaffirmed the rule declared in Black v. Comlth., *supra.* And as germain to what is well said in the opinion of each of those cases we would add, that where the misconduct of the jury or officer in charge of them, complained of, does not become known to the defendant, or his attorney until after verdict, in applying for a new trial on that ground, it nevertheless, will be incumbent on him, by affidavit filed in support of the motion for a new trial, to communicate that fact, as well as the alleged misconduct to the trial court, together with such other facts as might conduce to prove that the alleged misconduct could not by the exercise of ordinary diligence on his part, or that of his attorney, have sooner become known to him, or the latter.

In this case the appellants, as we have seen, not only failed to comply in any particular with the requirements of the rule announced by the authorities, *supra,* but on the contrary clearly brought themselves under its condemnation. Therefore, we can but hold that the ruling of the lower court in refusing them a new trial on the ground of misconduct on the part of the jury, or deputy sheriff having them in charge during the trial, raised by their second contention was not error.

As both the third and fourth grounds urged by the appellants for the reversal of the judgment of conviction require consideration of the evidence, they will be disposed of together.

It appears from the evidence that late in the afternoon of the day on which the homicide in question occurred, the deceased, Tom Berry, and his son, George Berry, while on their way to Christopher were met at or near that station by the appellants, Watt Caudill and Kelly Caudill, who, in company with Austin Godsey and Beech Davis, were, as claimed by all of them, on their way from the village of Kerlis to Lothair, another railroad station beyond Christopher. It also appears from the evidence that at the time of this meeting, George Berry neither knew nor was known to any of the four men composing the appellants' party, except Watt Caudill, and that the appellant, Watt Caudill, was the only one of the four of that party that knew Tom Berry, the deceased, or was known by the latter.

While the evidence was conflicting as to much of what took place at the time of and immediately following the meeting of the parties, all of them in testifying agreed that the deceased asked the appellant, Watt Caudill, to play cards with him, which the latter declined to do, whereupon the deceased accused Watt of using in a card game played with him (deceased) that morning a deck of marked cards, by means of which he wrongfully won from him $50.00 of his money; and further, in substance, said to Watt that it was his wish to play cards with him again that he might have an opportunity to win back the $50.00.

Watt Caudill made no denial of having played cards with the deceased that morning, but did deny his use of marked cards at that time. Upon hearing that denial George Berry, who was then standing behind his father, cursed Watt Caudill and denounced him as a liar. Ac-

cording to the testimony of George Berry he at that juncture received a blow on the mouth, inflicted, as he then believed, with a bottle wielded by Austin Godsey, who, together with the appellant, Kelly Caudill, was standing near but somewhat in the rear of the witness. The witness failed to positively identify Godsey as the striker of the blow received by him, the reason for which is explained by his admission that when it was received he was looking at the appellant, Watt Caudill, who was in front of his father. But both Austin Godsey and Beech Davis testified that the blow received by George Berry was inflicted by the appellant, Kelly Caudill, though they stated that it was not inflicted with a bottle, but with his fist.

George Berry also testified that he did not then, or at any time during the difficulty, have a pistol, but that his father was armed with a "38 special" pistol; and that the blow given him (witness) was immediately followed by a pistol shot from Austin Godsey at his father, who at the time was resisting a joint attack from the appellants, Watt and Kelly Caudill, both of whom had grabbed and were then striking and struggling with him, in which they received the assistance of Austin Godsey, who, with his pistol, shot the deceased in the breast; then turned toward George Berry and fired two or more shots from the pistol at him, which caused the latter, who was unarmed, to quickly run to a place of safety behind a hillock or bank nearby; and that before his arrival at the point of safety, other shots were fired at him, but whether by Godsey, or another of his party, he was unable to state. The witness did not return to where his father was shot, nor again see him alive.

According to further testimony from the same witness, his father did not draw his pistol until attacked by the appellants; and that just before he (the witness) was driven from the scene of the fighting by the pistol shots fired at him by Austin Godsey, he saw one of the two appellants, who were still struggling with his father, take from the latter his pistol and strike him on the head with it, and then heard the appellant, Kelly Caudill, say: "Kill the damn son of a bitch;" and last of all, saw the two appellants holding his father and the latter slowly sinking to the ground.

Austin Godsey and Beech Davis were the first witnesses introduced by the Commonwealth. It was sub-

stantially testified by the former that the fight resulting in the death of Tom Berry began with a blow from appellant Kelly Caudill's fist on the mouth of George Berry when George denounced the appellant, Watt Caudill, because of the latter's denial of the charge made by Tom Berry that he (Watt) had used marked cards in the game of poker played with him that morning, and that when George Berry received the blow from Kelly Caudill, Tom Berry drew his pistol from his pocket, seeing which act, Beech Davis tried to grab the weapon but failed to do so, and got out of the way behind a bank. That Tom Berry then fired his pistol at Kelly Caudill, who jumped out of the way and was not hit, and that as the ball from the pistol came in his (Godsey's) direction, he drew his pistol and shot at Tom Berry, and also fired two shots at George Berry, who fled to and got behind a bank, where he remained. Godsey also testified that he shot three times at Tom Berry and the latter several times at him, and that after his (Godsey's) last shot at the latter, he turned around and fell against a bank, and that as he staggered toward the bank Kelly Caudill grabbed his pistol from him and with it fired one shot at George Berry, who was then disappearing from the top of the bank to which he had fled, but that he (Godsey) did not see George Berry have or display a pistol at any time during the difficulty, nor did he see or know of his taking any part in the shooting that then occurred.

Godsey further testified that after Kelly Caudill took the one shot at George Berry, Watt Caudill said to him of Tom Berry, who was still lying against the bank where he fell after the last shot from Godsey's pistol: "Watch that s—n of a b—h, he is possuming on you," and that Kelly Caudill thereupon approached the wounded man and shot him in the back with his own pistol, after which, turning to Watt Caudill, he said: "The d— s— of a b— won't possum any more."

The testimony of Beech Davis agreed, in the main, with that of Austin Godsey and George Berry in its relation of the time and place of the meeting of the two Berrys with the appellants and their companions and of the conversation that ensued between the Berrys, father and son, and the Caudills, Watt and Kelly, which, according to his testimony as well as that of Godsey and George Berry, was followed by the blow given the latter by Kelly

Caudill which brought on the shooting that resulted in the death of Tom Berry.

Davis also testified that when George Berry received the blow from Kelly Caudill, Tom Berry drew his pistol from his pants pocket and (to use the language of the witness) "started firing down the river in the direction of Austin Godsey, Kelly Caudill and myself." The witness tried, as he stated, to knock down the pistol and hand of Tom Berry, failing in which attempt he ran to a bank only a few steps distant, behind which he remained out of the range of the pistol shots until the shooting ceased, though it was continued both by Tom Berry and Austin Godsey until, and for a brief time after, he reached the bank, and that after he got out of view behind the bank he heard Watt Caudill, whom he at the time could not see, but whose voice he recognized, say to some person with, or near, him: "He is possuming on you," to which the witness said he heard no reply, but that the statement from Watt was quickly followed by one or more pistol shots fired by some person unseen by him.

Davis further testified that shortly thereafter he returned to the scene of the shooting, and there found Austin Godsey, Watt and Kelly Caudill present, the latter then being in possession of a "38 special" pistol, which he was holding in his hand. Upon seeing the body of Tom Berry lying on the ground, the witness (Davis) expressed the opinion that he was dead, to which some other person present, whom the witness in his excitement failed to observe or recognize, added the statement, "Let him die."

The author of the statement added to that of Davis, or of a similar one, seems to have been identified by Arthur Clay, another witness for the Commonwealth, from whose testimony it appears that he was not an eyewitness to the homicide in question, but was at that time only 75 or 100 yards distant and heard the several pistol shots that were then fired, and that when the shooting ceased, he went to and arrived at the place of the tragedy within the succeeding five minutes, where he found the deceased, Tom Berry, lying on the ground unconscious and standing near him the appellants, Watt and Kelly Caudill, also Austin Godsey and Beech Davis.

As Tom Berry was unknown to Clay, he asked Watt Caudill, his only acquaintance among the other four

persons named, who he was, to which the latter replied that he did not know. About that time, as further testified by the witness, one of the three persons with Watt Caudill asked (referring to Berry) if he was dead, to which another gave the answer: "No he ain't dead, but he is dying," which brought from Watt Caudill the statement: "Let the G— d— s— of a b— die."

Five witnesses, in addition to Abe Newberry and Martha Sams, whose testimony is set forth on a preceding page of the opinion, testified as to the intoxicated condition of the appellants and their companions, Godsey and Davis, viz.: Effie Bird, Della Combs, Dorothy Money, Malenda Dixon and Joe Asher, some of whom saw and were near the group of four composed of the Caudill brothers, Godsey and Davis, immediately before their meeting with Tom and George Berry, and others immediately thereafter, all of whom, in testifying, expressed the opinion that each of the four was drunk, or in a partially intoxicated condition, which opinion, as testified by the witnesses, was based on their observation of the boisterous conduct of the four and readiness to quarrel with and fight each other, which one of the witnesses said they seemed about to do as she passed them.

G. W. Nicholson, the witness last introduced for the Commonwealth, and who was the undertaker and embalmer entrusted with the preparation for burial of the body of Tom Berry, testified that the deceased received three bullet wounds, one in the breast, another in the side and yet another in the back, which the witness regarded the fatal wound, as after entering the back the bullet, in the opinion of the witness, went in the direction of and penetrated the heart of the deceased. It appears from Nicholson's testimony and that of George Berry, which was uncontradicted by that of any other witness, that the coat worn by Tom Berry at the time he was shot was powder burned where the bullet that penetrated his back entered, and, according to the testimony of Austin Godsey, that bullet was fired by the appellant, Kelly Caudill, with the pistol he took from Tom Berry as the latter was falling, or after he had fallen against the bank.

The appellants, Watt and Kelly Caudill, in testifying contradicted all evidence in behalf of the Commonwealth that conduced to prove the participation of either of them in the killing of Tom Berry. The contradictions included

denials that either of them was then drunk, had a pistol, or struck Tom or George Berry; or that Kelly Caudill took from Tom Berry his pistol, or with it shot him in the back, or at George Berry. In brief, they denied every act and statement attributed to them by the witnesses for the Commonwealth except the attack made by them, God sey and Davis, upon the two negroes just before the meeting of the four with the Berrys, and the fact that Watt Caudill had that morning played a game of cards with Tom Berry and won of him $50.00.

In connection with the denials referred to, the appellants each testified that Tom and George Berry were each armed with a pistol, with which they simultaneously began shooting at the appellants and in the direction of Austin Godsey, which was immediately followed by shots from the pistol of the latter directed at them.

The only other evidence introduced for the appellants was furnished by the witnesses, F. C. Cornett and Sam Stamper. Cornett testified that he had known George Berry two or three years and was acquainted with his "general moral reputation," and that it was bad; but in what respect it was bad or whether it affected his veracity the witness did not state. Stamper testified that he had known the deceased Tom Berry and his son George two or three years, and was acquainted with the reputation of each of them, and that Tom Berry had the reputation of being a "dangerous man." But he claimed to have heard only two men discuss his reputation, the name of one of whom he was unable to recall. With respect to George Berry, the witness said his "general moral character and reputation from what the people generally said of him was bad," but the witness failed, as did Cornett, with respect to George Berry, to state in what respect it was bad. He denied that he entertained any ill will against or toward George Berry, but admitted the previous occurrence of a difficulty, or trouble between his son and the latter, growing out of a poker game.

It is patent from what has been said of the evidence that it required the submission of the case to the jury. This would be true, even if it properly could be said that the testimony of Austin Godsey and Beech Davis, the alleged accomplices of the appellants, was uncorroborated, as there would remain the testimony of George Berry that the fight was brought on by the appellants,

Watt and Kelly Caudill, assisted by Austin Godsey and Beech Davis, beginning with the blow given him by Kelly Caudill, immediately followed by the joint attack from Watt and Kelly Caudill upon his father, which was accompanied by pistol shots fired by Godsey at the latter and thereafter by others fired by him and Kelly Caudill at the witness, and by Kelly at Tom Berry.

In view of this testimony of George Berry and that of the two witnesses who saw the unprovoked and undenied attack of the appellants, Watt and Kelly Caudill, and their companions, Godsey and Davis, upon the two negroes twenty minutes before the occurrence of the homicide, and also that of the several other witnesses, some of whom met or saw them just before and others immediately after the homicide, and all of whom, as well as the two who saw the attack upon the negroes, testified that each of the four was drunk and appeared to be in a belligerent mood and apparently eager to engage in a quarrel or fight, we are not prepared to say that the verdict was without support from the evidence.

It is not necessary, however, to rest the above conclusion wholly upon the testimony of George Berry and that of the other witnesses last referred to, as it is also sustained by much of the corroborative testimony of Godsey and Davis. Indeed the only material disagreement between the testimony of Godsey and that of George Berry arose out of a statement of the former that the first shot fired by him at the deceased was in response to one fired by the deceased at Kelly Caudill, that missed the latter, but came in the direction of the witness, which statement was contradicted by one from George Berry to the effect that the shot from Godsey at the deceased preceded any shooting on the part of the latter, and was the first shot fired on the occasion in question; and that at the time of the discharge the deceased was engaged in a struggle with the appellants, who were trying to prevent him from drawing, or to take from him, his pistol.

It is apparent from the synopsis we have given of the evidence as a whole, that there is no merit in the contention of appellants' counsel that it contains no corroboration of the testimony of the appellants' accomplices Godsey and Davis. On the contrary, it shows the corroboration of a number of their material statements. This is notably true of the statements made by both Godsey and Davis in testifying on the trial, that the blow re-

ceived by George Berry in the mouth, which began the combat that led to the shooting of the deceased, was struck by the appellant, Kelly Caudill, and that the deceased made no attempt to draw or use his pistol until he saw that blow given.

This testimony of Godsey and Davis agreed with and was fully corroborated by the testimony of George Berry. Godsey and Davis also testified that at no time before, or during, the shooting that took place, did they, or either of them, see a pistol in the hands or possession of George Berry, nor did they, or either of them, see him fire a pistol or take any part in the shooting, and that after being twice shot at by Godsey, he sought safety behind a bank and did not again return to the scene of the shooting; and this testimony was also corroborated by that of George Berry.

The testimony of Godsey that the appellant, Kelly Caudill, took from the deceased his pistol and, following the statement of Watt Caudill that the latter was possuming, shot him in the back, was corroborated in part by Davis, but more fully by the testimony of the undertaker and the bullet hole in and powder burns on the back of the coat.

It must be conceded that the corroborating evidence referred to is of such unusual force that it must have had weight with the jury. It is not necessary that the corroborating evidence should be such that it, in and of itself, would authorize a conviction; nor is it necessary that it should be equivalent to the testimony of an eye-witness. Mattingly v. Commonwealth, 195 Ky. 839; Anderson v. Comlth., 203 Ky. 681.

It is apparent from the evidence as a whole that it furnishes no basis for the appellants' complaint that the verdict of the jury is flagrantly against its weight or effect. "And, we are authorized to reverse a judgment as being flagrantly against the evidence only when it appears that it was so much against the weight of the evidence as to shock the conscience and clearly appear that it was the result of passion or prejudice on the part of the jury." McCurry v. Comlth., 205 Ky. 211.

In a trial by jury the jurors are the sole judges of the facts and in all cases of the credibility of witnesses as well as of the effect to be given all facts and circumstances in evidence. Haynes v. Commonwealth, 194 Ky.

469; Borden v. Commonwealth, 191 Ky. 651; Belcher v. Commonwealth, 203 Ky. 757. And as the record in the instant case gives us no cause for holding that the verdict of the jury was not properly arrived at the judgment as to each of the appellants is affirmed.