## Warner v. Commonwealth.

(Decided October 30, 1931.)

H. D. PARRISH, J. F. SUTTON and E. B. ROSE for appellant.

J. W. CAMMACK, Attorney General, and GEO. H. MITCHELL for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellant, William Warner, at his trial under an indictment returned in the Lee circuit court accusing him of murdering his wife, Sarah J. Warner, was convicted and punished by confinement in the penitentiary for life, and from the order overruling his motion for a new trial, and the judgment rendered thereon, he prosecutes this appeal. But three reasons are presented in argument of counsel for appellant as grounds authorizing a reversal of the judgment, and which are: (1) That the evidence was insufficient to authorize a submission of the case to the jury, and for which reason a peremptory instruction of acquittal should have been given; (2) error of the court in admitting prejudicial and incompetent testimony offered by the commonwealth; and (3) error of the court in overruling defendant's motion to carry the jury to the residence of Vina Johnson, a daughter of appellant, for the purpose of hearing her testimony there, she being confined therein and unable to attend court, and which residence was located in the country some three or more miles from the county seat.

The determination of ground (1) requires a substantial synopsis of the testimony heard at the trial. Appellant and his wife lived in the country alone in a remote section of Lee county, and had been married for forty years or more. Six children had been born to them, but two of them were dead at the time of the

tragedy here involved, the last death being that of a son, and which occurred about a year before the killing. Within that period, a sister of appellant also died at the Warner residence. Up to within eight or nine months immediately preceding the death of Mrs. Warner, an unmarried daughter of the couple had lived with them, but at that time she left and lived elsewhere in the neighborhood, but she thereafter made infrequent visits to the home of her parents. Elsie Thacker, a girl fourteen years of age, lived in the home of Mr. and Mrs. Warner as a helper, up to within about four months of Mrs. Warner's death. The Warner residence building consisted of a log house with two rooms separated by a partition in which was a stack chimney, and in one of them there were two beds, one of which was occupied by Mr. and Mrs. Warner, and they had each retired in it on the fatal night, which was January 20, 1931.

A door opened from that room, which was about fourteen feet square, on to a covered porch about eight or nine feet wide, and which occupied the space between the two log rooms and a boxed room that was constructed as an addition to the original residence composed of only the two log rooms. On the side of the wall of the sleeping room in the log house opposite to that door, and also opposite to the side of the room upon which the bed was located, hung a .45 caliber pistol in a scabbard. In the corner of the bedroom and against the partition wall was a broom, and the space off from it toward the fireplace was used for the deposit of fire wood. There was a rocking chair or two in the room, and as many as two ordinary sitting chairs without rockers.

According to the testimony of appellant, Mrs. Warner retired about 6 o'clock p. m., on the day involved, and he followed her about thirty minutes thereafter, but neither of them went immediately to sleep, but he did do so within an hour thereafter. He testified that about 9 o'clock he was awakened by a shot from the pistol that had been hanging on the wall, as hereinbefore described, and he saw his wife standing in the floor between the bed and the fireplace apparently stepping backwards as if to set herself in the rocking chair immediately behind her, but she failed in the effort to adjust herself in the chair, and fell from it to the floor. He picked her up and put her upon the bed, and immediately dressed himself and went to the home of Robert Goe, a neighbor, to request him and his wife to come to the Warner resi-

dence, which they did as soon as they could dress themselves. Appellant gave, while testifying at his trial, the facts we have outlined, and in addition thereto that his deceased wife was and had been afflicted for some years prior to the tragedy, and that her mind appeared to be affected. The immediate affliction as described by appellant was a swelling of the feet and lower limbs, and an apparent disorder of the kidneys evidenced by their frequent action. He likewise stated, though only a layman, that she appeared to have some dropsical symptoms which he concluded evidenced a bad heart. No physician was introduced or testified as to the mental or physical condition of Mrs. Warner at any time.

Appellant also testified that some ten or twelve years prior to the killing his wife became seized with some sort of affliction that affected her mind for two or three days. She was treated at that time by Dr. Pryse, who had died eight or ten years before the trial. Appellant was corroborated by another lay witness as to his wife's condition at that time. Neither he, nor any other witness who testified in the case, made any claim that the then mental condition of his wife continued from that time until her death, or that there was ever a return of that weakened state of mind at any time thereafter. That described condition and that attack might be accounted for as a result of nature's change in a woman's life occurring at about the age of Mrs. Warner at that time, she being about 62 years old when she died.

For the prosecution, Mr. Goe and wife, the coroner of the county, and a number of other witnesses, testified to the physical conditions in the room where the tragedy occurred immediately following it; and a physician and the coroner testified to the character of wound produced by the bullet upon the body of Mrs. Warner, together with other bruises and wounds found on different parts of her body. Such testimony was undisputed and all of it was admitted by defendant, but he attempted to explain away some portions of it. The facts so testified to were: That the bullet entered the body of the deceased almost under the left arm and some three or four inches below the armpit and came out at the right of the spinal column at about the same level, and it was the only shot wound upon her body; that the thumb and index finger of her right hand and extending down over the web between them was discolored, indicating powder burn; that there were several contusions or bruises of recent infliction on

the lower half of the left upper arm covering a surface of three by four inches and the same conditions on the right forearm, and also on the face just above the cheek bone; that there were also upon her arms and face older bruises and contusions which nature had covered with scabs in its healing process; that both buttocks were bruised and of recent infliction; that there was blood on the upper lip and exuding from the nose, but the physician explained that such condition may have been produced from breathing after the shot wound had been inflicted. ·

The handle of the broom, the place for which was in the corner, was freshly broken near the place where the handle and straws met. One of the straight chairs had its rounds freshly broken out, and one witness testified to seeing one of them under the bed, but which seems to have escaped the attention of the other witnesses. There was a fresh scooped out trench, or trough, in a plank of the floor between the fireplace and the door, which was evidently made by a bullet shot from such an angle as to cause it to bounce and not penetrate the floor at that angle, and a bullet was found on the floor, supposed to be the one that made the described indenture. There was also discovered a bullet hole in the upper part of the shutter of the door leading out on the porch, and opposite that hole in the wall of the boxed house on the other side of the porch was a bullet buried in a plank composing a part of its outer wall, and which hole and the place where the bullet penetrated the boxed house were fresh and of recent making. A burlap sack was found in the room through which was a bullet hole and at one place there were discolorations which counsel for appellant insist were powder burns, but no witness so stated, and how it became involved in what occurred there that night is unexplained. There were other physical facts testified to upon which a persuasive argument can be constructed contradicting the theory of suicide, which is the one advanced by appellant in his defense. Those that we have catalogued, together with the other minor ones that we have omitted, are urged by the prosecution as conclusive against the contention of appellant as to both the person who did the shooting and the manner in which it was done.

Although appellant denied any hostile feeling toward his wife, or that he inflicted upon her any physical punishment, we have the testimony of the daughter,

and the servant girl that he was and had been for a long time hostile to and cruel toward her, and had frequently punished her physically, and also threatened to kill her. We also have the mute evidence that someone (or some unexplained accident) had, not only formerly produced marks of violence upon the body of deceased (and which was evidenced by the scabs on her person testified to by the physician and others), but also that one or the other of the same causes had recently produced the same character of fresh marks, and appellant furnishes no testimony in explanation thereof. In addition thereto, it is plausibly argued by counsel for the commonwealth that it would be extremely difficult for Mrs. Warner, who was righthanded, to have inflicted the pistol wound that resulted in her death in the manner it was made. In order to do so, it would have required considerable curvature in her right arm so as to hold the pistol at the angle that the bullet took, and in no event could it have been so produced without plain and visible powder burns upon either her clothing or her body. Moreover, the bullet hole through the door leading on to the porch and the bullet that made it, and found lodged in the wall of the boxed house across the porch, are most convincing pieces of mute evidence that at least one other shot was fired on that occasion than the one penetrating the body of Mrs. Warner, and appellant claims that only one shot was fired on that fatal night.

Appellant, as we have said, does not attempt to explain or to account for such physical evidence. He admitted that all of it was true, but when or how such conditions happened he did not know. It is also significant that the first witness who discovered the bullet hole through the door leading out on the porch saw a small piece of paper in it which she extracted and thereby revealed the bullet hole. The pistol had in it one empty shell and one empty chamber; but two shells were found either in the hall or one in the room and one in the hall, the exact place not being material. In addition to all of the foregoing, it should also be noted that in narrating the occurrence to Mr. and Mrs. Goe, made by appellant immediately after the tragedy, he said: "That his wife had dropped a pistol or knocked it down or something and killed herself." At his trial, he made no insistence upon any such accidental shooting but claimed that it was done by his wife with suicidal intent, although he stated that he did not see the shot fired, but that he was

immediately awakened by the report of the pistol, and he denied that he stated to Mr. and Mrs. Goe that deceased had dropped or knocked down the pistol, and thereby caused herself to be accidentally shot. A refutation of the claim of accidental shooting in that manner could be easily drawn from the fact that it would have been practically impossible for a shot from a pistol dropped upon the floor to have entered the body of Mrs. Warner at the place where she was shot, and to have taken the range that the bullet took that passed through her body.

It is most strenuously insisted in support of grounds (1) and (2) that the evidence as so outlined was both insufficient to authorize a submission of the case to the jury, and of course, insufficient to sustain its verdict. But we cannot agree with that contention. The mute facts appearing in the record, the most of which are undisputed, speak in most convincing terms, and they, coupled with the proven conduct of appellant toward his wife and his hostile state of feeling against her, which the jury were authorized to conclude was true from the testimony (plus the additional fact that no reasonable motive existed for the alleged suicide, and that parts of appellant's testimony are out of harmony with human conduct), are to our minds sufficient to overcome the testimony of appellant alone as to how his wife met her tragical death, and to authorize the jury to find as it did by its verdict that he fired the shot that killed her instead of herself doing so.

The facts in this case are in many respects analogous to those appearing in the case of Epperson v. Commonwealth, 227 Ky. 404, 13 S. W. (2d) 247. The only points of difference are, that perhaps in the Epperson case there was more evidence of a struggle found in the room where the shooting occurred than was proven in this case. But the physical facts hereinbefore outlined, contradicting the theory of the defendant on trial, are much stronger in this case than were like ones in the Epperson case. We held in that case that the evidence there appearing, though less convincing of defendant's guilt than is the testimony in this case, was not only sufficient to authorize a submission of the case to the jury, but was also sufficient to sustain the verdict of guilty. Necessarily each case must be determined by its own facts, and whenever the testimony is of such a nature as to convince a reasonably prudent person (to the degree

required by the law) that the homicide was committed by the accused in a way and manner to render him punishable therefor, a verdict in accordance therewith cannot be said to be rendered under the influence of passion and prejudice so as to make it flagrantly against the evidence. It is the duty of the trial court to weigh the testimony and to pass upon its sufficiency to authorize a submission of the case, and to also determine whether a verdict of conviction is or not flagrantly against the evidence. Such rulings of the court are also to be tested by the facts and circumstances of each case, and if there has been no abuse of that authority a reviewing court is without authority to disturb the verdict. It may be that this unfortunate appellant is not guilty, but the same might be said about practically all persons accused and convicted of crime. The impartial jury who tried him has found upon evidence sufficiently convincing that he is guilty, and it is not in our province, nor could we do so in this case if we possessed the authority, to say that it did not have before it sufficient evidence to support its verdict, and for which reason ground (1) is overruled.

The only incompetent evidence complained of in ground (2) is the testimony of the daughter of Mr. and Mrs. Warner who testified about her father's attitude and conduct toward her mother up to within about a year before the trial, and which was in the neighborhood of ten months before the tragedy. The argument is, that the matters proven were too remote, there being no contention that the testimony would not be relevant and competent if of more recent occurrence. In support of this ground, the cases of Stewart v. Commonwealth, 235 Ky. 670, 32 S. W. (2d) 29, and Turk v. Commonwealth, 239 Ky. 55, 38 S. W. (2d) 937, are cited and relied on. But the principles announced in those cases are not applicable here for a number of reasons, a sufficient one being that the facts attempted to be proven in them were of such a nature and so far removed from the guilty occasion that they could not possibly have any bearing upon the principal fact sought to be proven, i. e., the guilt of the defendant on trial. Besides, there were only single and unrepeated transactions attempted to be proven in those cases, which would not necessarily indicate a settled aversion or condition of mind, but which the conduct of appellant in this case was calculated to produce. Section 496 of Roberson's Criminal Law properly states the rule on this subject. In it the learned author dis-

cusses the admissibility of this character of testimony and what he says therein, supported as it is by cases cited from this court, forces the conclusion that the court did not err in this case in admitting the only complained of testimony under this ground.

Ground (3) arises from this state of facts: There was no motion for a continuance of the trial, both sides announcing ready. The last witness introduced by defendant was a Mr. Price, the son-in-law of appellant and the husband of his daughter, Vina, the latter of whom was confined in her home in such condition that she could not appear at the trial and testify in the case. Price testified that he lived at the time of the trial, and for some time prior thereto, about three miles from appellant's home and was there at infrequent intervals, and when there he neither saw nor heard any fact indicating hostility between Mr. and Mrs. Warner. He also testified as to the physical condition of his wife and her inability to attend court. Whereupon counsel for defendant moved that the jury be taken to her home and to receive her testimony there. The court indicated that in no event could he entertain the motion until some basis therefor was manifested in the form of an affidavit, and requested counsel to prepare one. The latter insisted on leaving the courthouse to prepare it, when the judge requested that he do so at some convenient place in the courthouse, so as to not materially interfere with the progress of the trial. Counsel declined to do so, and the trial was adjourned for noon. When the court reconvened after the noon recess, associate counsel presented an affidavit showing what Mrs. Price would testify to, and the court then permitted that testimony to be read to the jury, with the instruction that it should be received and given the same weight as if the absent witness had been sworn and testified to it before the jury. That testimony, as incorporated in the affidavit, was but little more than the substance of what had been testified to by Mr. Price, i. e., that the absent witness would state that she had "visited her said father and mother quite frequently since their marriage, and that her father and mother were always kind to each other; that she never saw her father, the defendant, mistreat or do any harmful thing to her said mother, and that she never at any time during all of her association with him heard as much as a cross word between them. She would also testify that her mother, the deceased, was and sometime prior to her

death was subject to despondency, which affected her mind; and that her mother's legs were swollen.''

In the first place, that testimony is at most very indefinite, especially so as to the times and occasions of the visits of the witness to the Warner home and the proximity of them to the happenings being investigated. But, putting aside those considerations, defendant had voluntarily entered into the trial without the presence of that witness, or revealing her testimony or her inability to attend the trial, and he made no effort to postpone it on account of her absence. However, the court was considerate of his rights, and gave him the benefit of the testimony of the absent witness in the way it was done.

Perceiving no error prejudicial to the substantial rights of appellant, the judgment is affirmed.