## Banks v. Commonwealth.

March 24, 1939.

John W. Caudill, Judge.

CARL PERKINS for appellant.

HUBERT MEREDITH, Attorney General, and J. M. CAMPBELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Reversing.

Appellant was indicted by the grand jury of Knott county for the murder of Anderson Breeding. Upon trial he was convicted of voluntary manslaughter and sentenced to confinement in the penitentiary for a term of two years.

His motion for a new trial was supported by twelve or more grounds. Counsel for appellant now insists that the court erred:

(1) In overruling demurrer to the indictment.

(2) In not sustaining appellant's motion for a directed verdict in his favor.

(3) In refusing the introduction of relevant and competent evidence offered in behalf of accused.

(4) In giving faulty instructions. And that

(5) The verdict of the jury is palpably against the evidence.

It is argued, and the record shows, that the indictment was headed "Perry Circuit Court," when in fact the appellant was tried and convicted in the Knott circuit court where the offense was committed. Our attention is directed to section 122 of the Criminal Code of Practice, which sets out the essentials of an indictment, among which one is that it shall specify the name of the court in which the indictment is presented.

The contention of appellant is without merit, as will be determined by reference to a few opinions of this court dealing with this subject. In the instant case the body of the indictment made it clear that the offense was charged to have been committed in Knott County. This was amply sufficient to advise the accused that he was indicted and to be tried in the Knott circuit court for an offense committed in Knott County. In Johnson v. Commonwealth, 15 S. W. 662, 12 Ky. Law Rep. 835, we held that the omission of the name of the county from the caption did not vitiate the indictment, where the body showed the true name of the county in which the offense was charged to have been committed. See also Romans v. Com., 231 Ky. 487, 21 S. W. (2d) 797; Hamilton v. Com., 247 Ky. 579, 57 S. W. (2d) 516.

Appellant cannot well complain of the minor defect in the caption of the indictment, since the record shows that on the same day the indictment was returned he entered appearance; did not object to an assignment of the case for trial, and later entered motion for and was granted bail. All this occurred in the Knott circuit court.

Appellant, 59 years of age, lived in Knott County on Carr's Fork for thirty years, and had known Breeding for approximately that length of time. He operated a store on Carr's Fork and slept in the rear thereof. On the day of the homicide Breeding, who lived a half-mile from the store, came riding up the road toward

his home, at about 5:30 or 6 o'clock. At that time Melvin Amburgey and wife were sitting on the platform in front of the store with appellant. He describes the store as being 36 feet long and 20 feet wide, and the side next the road is "very near the ground and the side opposite the road is about a foot from the ground, and the platform in front of the store, there is a kind of little bank there." The platform was 16 feet long and about 12 feet wide; two doors lead therefrom into the store. The left end of the platform toward the branch is about 4 feet off the ground, and the side next to the road runs from 20 inches to about 4 feet off the ground.

Appellant attaches some importance to this description in connection with the course of bullet wounds found in Breeding's body. It is about 300 yards from the store to Lloyd Back's home, near the mouth of Smith's Branch. Appellant's divorced wife lived up another branch, 200 or more feet from the store. There was nothing between the store and the county road, but above the store and along the side of the road there was undergrowth, briars and weeds.

Appellant says while sitting on the right side of the porch, "as you face down the branch," Amburgey and his wife sitting near, he looked down the road and saw Breeding coming. He was "about 150 or 175 feet away. There was a mud hole there and he was riding around it. He came opposite and about 20 or 30 feet from the platform; checked his horse, and said, 'Hello there, John wheelborrow,' and I spoke back to him and said, 'Hello there, cat—,' and when I said that he had his gun in his right hand. * * * He jerked his gun and fired twice and that scared the horse and he went jumping and moving around, and I saw a chance and I got out of my seat and went through the door and as I went through the door there was another shot fired and I run on into the house. * * * I had a 44 gun back in the table drawer, and I come back there and got my gun and I heard the horse moving down the road. I come out there and Breeding was down the road just a little, and was setting there on his horse; he had the cylinder of his gun out, looked like he had been putting cartridges in it. He saw me and fired two shots at me through the window. I fired two shots at him and his horse moved from there and went back toward the creek. * * * I decided to leave the window and I started toward the

door and as I went there was a 38 gun laying on the table and I got it. Then I heard the horse running up the road, and I went on to the window and looked out to see if he was gone. He was standing out there in the edge of the road where he could see the window, with his gun up this way, and he hollowed: 'Come out of there you damn s. o. b.' and raised his gun up, and I jumped toward the edge of the door and he went to firing, and I fired that 44 gun twice more at time and then he shot twice more too at that time. Then he shook the shells out of his gun and started walking around toward the door and said, 'G. d. you,' and I reckon I fired the 38 at him. Then he walked up the road a little piece and got behind the storehouse, and that was the last I saw of him. * * * When I done the last shooting I was about two or three feet in front of the door on the platform.''

Appellant later admits that he fired seven shots. He showed that Breeding had made threats to take his life. On cross-examination he said he owned only one pistol, the 44; a neighbor had left the 38 there on the previous Sunday. He and Breeding had had trouble over barbed wire which appellant had sold him. Breeding had been living on adjoining land owned by appellant's former wife. Appellant had warned Breeding not to come through his barn lot. They had been on bad terms for more than fifteen months.

A witness, who lived near the scene of the homicide, said he heard shots, and Breeding's boy came running up and said his daddy was killed. Witness went up the road after hearing the shots, and found Breeding dying. He went back to the store, and learned that appellant was not hurt. Appellant asked him to go to Hindman with him, ostensibly for the purpose of making surrender. He complied and appellant told witness that he had shot Breeding; emptying his 44, and firing three shots from the 38. This witness says he heard "between 10 and 20 shots.''

Other witnesses testify as to hearing from 7 and 9 to 12 or 15 shots. One witness testified that appellant said he "had to kill Breeding,'' who had fired the first shots. Lloyd Back, a neighbor with whom appellant took his meals, heard the shots and shortly thereafter found Breeding lying on the side of the road at a point about 165 feet from the rear of the store. He said he

saw horse tracks "going up the road," and from appearances it looked as if the horse was going pretty fast.

A son of Breeding's picked up his 38 pistol and took it home with him. He said his father had nine cartridges when he left home that day. The son examined the pistol after the homicide and it had five cartridges in it; he saw nothing in the barrel which would indicate it had been fired. The boy said he heard nine shots, all alike, but with a slight pause; four, then two, then three. He described the wounds as best he could; three up near the right breast; three in the side of the breast; one lower near the belt line; one under the arm, and one in the center of his back. This witness, as did others, testified that the point where Breeding's body was found could be seen from the rear of the store, but not from the platform.

A physician who examined the body testified that the examination was made difficult, since Breeding's body was exhumed under court order, fifteen days after death. He said decomposition had set in; "livid textures and definite markings had been obliterated." There were nine circular openings, similar in size and appearance; one was less than an inch to the right and horizontal with the tip of the breast bone; another about two inches to the right of and below No. 1; another on the same plane, and below No. 2. A fourth was about two inches below the arm pit in the side; another in the right lower quarter of the abdomen. Nos. 6 and 7 were in the inner and outer part of the right arm, behind the humerus; No. 8 was directly over the twelfth dorsal vertebra, and No. 9 about 1½ inches below the crest of the ilium. The witness could, or would not say that the bullet entering the backbone pierced or cut the spinal cord, the effect of which, as he said, would have produced instant paralysis of the lower limbs.

Taking this testimony with that of another physician who had assisted Dr. Pinkley, it may be reasonably concluded that there were actually five distinct points of entrance. It may be gathered from this and other evidence, that at least one shot penetrated the vertebra, entering from the back.

It was shown that Breeding's body was lying on the left side of the road, at the distance from the rear of the store above stated. It was shown that there was a

path on the left side of the road leading from the store to and above the point where the body was found, and that there was underbrush on that side of the road.

One witness testified that at some point in the path and some distance from the store, markings showed disturbance of the underbrush, and indications that shots had been fired from the rear of the store toward the point where Breeding's body was found. There was testimony that Breeding had on more than one occasion threatened to kill appellant; that deceased had a bad reputation for peace and quietude, evidenced to a greater degree when under the influence of liquor.

We have given sufficient evidence to permit us to pass on contentions Nos. 1 and 5. We have no hesitancy in saying that the evidence was such as to justify the court in passing the case to the jury. While the commonwealth's evidence is in the main circumstantial, yet the testimony as we have outlined it, and without repeating or calling attention to any particular portions, was such that the jury might well have concluded that appellant was not acting at all times during the rencounter in defense of his life. Physical facts indicate that Breeding might have been shot while fleeing.

Counsel insists that "this record discloses a case of clear self-defense." This would be a correct statement if the jury, under the law, were compelled to accept as true the testimony of appellant without regard to other proven facts, even though they be circumstantial. We have written not infrequently that when the accused admits, or it be shown beyond doubt that he fired the fatal shot, it becomes his duty to demonstrate to the jury that his act was in self-defense.

If the testimony be such as would be calculated to convince a reasonably prudent person to the degree required by law, that the accused committed a punishable homicide, and there is no showing of passion or prejudice on the part of the jury, the verdict cannot be said to be flagrantly against the evidence. Warner v. Com., 241 Ky. 118, 43 S. W. (2d) 524. A conviction will be upheld when, after considering the case upon its own peculiar facts in the light of human experience, there is a well-founded conviction of guilt, rather than innocence. Ledford v. Com., 267 Ky. 289, 102 S. W. (2d) 38. In cases where one who is charged with murder pleads self-defense and is convicted of manslaughter, and there is

evidence sufficient to justify a jury's conclusion that the act was not in self-defense, this court will not undertake to determine the weight of the evidence. It is only where the plea is thoroughly and clearly established that this court will reverse on appeal. Privitt v. Com., 271 Ky. 665, 113 S. W. (2d) 49.

We now take up the complaints as to the refusal to admit what is claimed to have been competent evidence. Appellant was asked to state in answer to one or two leading questions, what his belief was when he fired the shots at Breeding. The court sustained exceptions. An avowal was made that if permitted to answer he would have said: "I shot because he was shooting at me, and I was trying to protect my life." The exclusion was in no wise prejudicial, since without objection, accused in answer to two questions as to why he shot Breeding, said (and the reply related to both the shooting from the platform and inside the house): "Because he was shooting at me, and I was protecting my life." Again appellant said on cross-examination: "I killed him because I knew he would kill me if he could." This reason was also given by another witness to whom accused had made a like statement.

A more material contention is presented with relation to the court's action in sustaining an objection to appellant's statement, that he had been told (not too remotely) deceased had filed the hammer from his gun "so that when he went to shoot Mr. Banks, he didn't want it to hang." The court also sustained objections to the question of how many times he had heard of deceased making threats against him, but there was no avowal made.

We are of the opinion that the court erred in not permitting accused to tell of communicated threats made against him, provided not too remote in point of time, though that situation could hardly have existed here, since there was a showing of continued ill-feeling covering a period of more than fifteen years. The threatening language excluded, was used within the year prior to the encounter. In the case of Martin v. Com., 178 Ky. 540, 199 S. W. 603, appellant testifying for himself was asked whether previous to the homicide appellant's father had communicated certain threats made by deceased. The court refused to permit accused to answer and avowal was made. We held that the re-

fusal to permit him to answer was error, but not there prejudicial, because at another point in ·the testimony appellant had testified to the particular threat and its communication to him. We observed that the ruling was made upon the idea that the question and proposed answer were only reiterations. We also found it to be true in that case that witness who had heard the threat, testified that he had communicated it to accused. This situation does not appear here. It is true that a witness testified to the hearing of the threat or threats, but did not say they had been communicated.

We have held that threats by decedent against accused, though they may not have been communicated, are admissible as tending to show the state of decedent's mind prior to the killing, and as evidence as to who was the aggressor. Com., v. Thomas, 104 S. W. 326, 31 Ky. Law Rep. 899; Young v. Com., 42 S. W. 1141, 19 Ky. Law Rep. 929; Com. v. Hoskins, 35 S. W. 284, 18 Ky. Law Rep. 59; Sparks v. Com., 89 Kv. 644, 20 S. W. 167; Miller v. Com., 241 Ky. 818, 45 S. W. (2d) 461. In Com. v. Girkey, 240 Ky. 382, 42 S. W. (2d) 513, we held that threats or hostile acts on the part of deceased toward accused are admissible, where protection of life is the defense, for the purpose of allowing the jury to determine if possible, which party was the aggressor, or to show motive, malice or state of mind. The court should have permitted appellant to testify as to threats made against him, and of which he had been informed, and others to testify as to particular and general threats.

Contention is made that the court erred in refusing to let a witness state that on the day following the homicide he found two bullet holes in the house, "one that I know was a bullet hole, down low, and another up higher that they thought was a bullet hole."

Although the court sustained objection to the question, as we read the record there was enough testimony by this same witness, without objection, to show that he examined the house the next morning and saw a bullet hole down low in the house.

The difficulty with this proffered evidence is that appellant did not claim that any bullet struck the house. The nearest he came to saying so was when he said: "I heard the first one." The witness who undertook to testify as to the bullet hole, or holes, says he got his

information from Amburgey who said he saw a bullet hole the next morning. He had seen the deceased fire the first shot or shots. When asked if a bullet from Breeding's pistol made the hole, he answered: "I don't know if it did or not, it went in that direction," as he observed the blaze from the gun.

There is too much speculation about the alleged bullet holes. The testimony of the witness who undertook to state what he saw the next morning was based purely on hearsay, and same was not competent, nor can it be in the absence of a clearer showing that the holes were made by shots fired by deceased.

One witness was asked if he had not found a bottle on the body of deceased containing moonshine whiskey. An objection was sustained and witness avowed that: "It was a half-pint bottle about half full, and it smelled like moonshine whisky."

Another witness had testified that he had met and talked with Breeding prior to the homicide, and he stated facts which tended to show that Breeding was slightly intoxicated. There was testimony that Breeding was ill-tempered, especially when under the influence of intoxicants. In view of this testimony the court should have permitted the witness to answer the question. There is no hint in the record that appellant was other than sober. We have held that evidence of this character is admissible, because it might tend to assist the jury in concluding as to which was the aggressor, and as manifesting a state or condition of mind. Etherton v. Com., 246 Ky. 553, 55 S. W. (2d) 343; Caudill v. Com., 217 Ky. 403, 289 S. W. 371. We cannot say that the exclusion of this particular bit of evidence prejudiced appellant's right, but on another trial it should be admitted.

Rejection of other evidence is pointed out as having been prejudicial. We have examined such as is claimed to have been so, and fail to find sufficient substantial ground for objection.

Counsel complains of instruction No. 5 given by the court, which embodied in a "defense of home" instruction what is called the "modified self-defense instruction," based on the idea of abandonment by deceased. This instruction was properly given. It may have been inartistically worded, but presented to the jury the is-

sues. However, under all the facts, it might have been better to have given the self-defense instruction, with the modification, since it was not claimed by appellant that he was defending his home. If appellant's version of the case be true, he was entitled to an acquittal. If on the other hand appellant pursued deceased while he was attempting to leave the scene of the first difficulty, he was guilty of some degree of homicide.

Since the court erroneously ruled on the matter of introduction of evidence as indicated above, we reverse the judgment with directions to award appellant a new trial.

Judgment reversed.