**Clyde McQUEEN, Ray Napier and George Bryant, Appellants,**

**v.**

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

June 4, 1965.

Rehearing Denied Oct. 5, 1965.

Thomas D. Shumate, Shumate, Shumate & Flaherty, Steve Robbins, Richmond, for appellants.

Robert Matthews, Atty. Gen., Joseph Eckert, Asst. Atty. Gen., Frankfort, for appellee.

DAVIS, Commissioner.

Appellants Clyde McQueen, Ray Napier and George Bryant were jointly indicted, tried and convicted for slaying Ambrose Masters, Jr. in Madison County. The three were indicted for murder (KRS 435.010) but convicted of voluntary manslaughter (KRS 435.020). The jury's verdict found McQueen guilty of voluntary manslaughter and fixed his punishment at imprisonment for twenty-one years; appellants Napier and Bryant were found guilty of aiding and abetting in the voluntary manslaughter and their punishment fixed at imprisonment for eighteen years each. Upon this joint appeal the appellants present three basic assignments of error, some of which are composed of separate elements: (1) Error in admitting incompetent evidence and in rejecting competent evidence; (2) error in failing to grant directed acquittal verdicts for appellants Napier and Bryant, and (3) error in the inflammatory arguments of the Commonwealth's Attorney.

The opening scene of this tragic drama was at a beer depot in Richmond known as the Pony Keg. Appellant McQueen was there, in a car owned by John Morgan Smith, when the victim, Masters, walked up to Smith's car and helped himself to a can of beer. Masters was drunk and belligerent, according to the evidence for the defense. McQueen said that he remonstrated with Masters for the arrogant manner in which the latter had taken the beer. Masters flew into a rage and cursed and threatened McQueen, but McQueen did not then get out of the Smith car. Just then appellants Napier and Bryant drove into the Pony Keg parking area; McQueen said that he requested them to take him (McQueen) away in the Bryant car so that he could avoid trouble with Masters. When McQueen had gotten in the Bryant car Masters renewed his abuse and threats toward him, and "gouged" at him with a switchblade knife and threatened to kill him. McQueen said that Masters pressed the blade of the knife against McQueen's throat at the time of the alleged threat. Moreover, some reference was then made that Masters had a pistol, and that he intended to kill McQueen as well as Bryant and Napier.

There is variance in the evidence as to the details of this initial encounter at the Pony Keg, although it is clear that Masters did have a switchblade knife, which he is said to have delivered to one of the bystanders. At any rate, McQueen, Bryant and Napier then left the scene in Bryant's car.

Eight men, including Masters, piled into an automobile operated by Dallas Laws and proceeded to hunt for the Bryant car in which the three appellants had left. It was explained that the impression was gathered that McQueen and Masters had agreed to meet in the country to "fight it out." There was no direct evidence that McQueen had ever affirmatively agreed to such a meeting. The search for the Bryant car was

fruitless; the Laws car and its occupants returned to the Pony Keg.

A short time later the Bryant car, in which the three appellants were riding, passed by the Pony Keg. Someone sighted the Bryant car and shouted "There they go," whereupon five of the eight men who had engaged in the first search for the Bryant car re-entered the Laws car and gave rapid chase to the Bryant car. As to exactly what transpired during the course of this chase, the record is confusing and conflicting.

However, it is clear that the two vehicles ultimately came to a stop, not far from each other. According to evidence for the prosecution, appellant McQueen alighted from the Bryant car and began to shoot a pistol toward the Laws car. Other evidence for the Commonwealth depicts McQueen's coming alongside the Laws car, from where he thrust the pistol inside the car and shot Masters in the back. There was evidence that Bryant also got out of his car at the scene of the killing; some witnesses said that it seemed to them that shots were fired from more than one weapon.

As appellant McQueen tells it, when the two cars stopped, after having passed and re-passed each other en route, McQueen observed Masters getting out of the Laws car; McQueen, believing that Masters intended to carry out his threat to kill McQueen, and seeing "something in his hand," got out of the Bryant car and opened fire on Masters. No shot was returned by Masters or from anyone in the Laws car. McQueen denied that he had walked to the Laws car and shot Masters in the back.

One of the passengers in the Laws car, both on the first fruitless search and at the time of the killing, was Paul McQueen, a brother of appellant Clyde McQueen. During, or just after the shooting, Paul got out of the Laws car and got into the Bryant car.

Laws and the other occupants of his car departed the scene and went to the Richmond police station. Masters was dead on arrival there. The coroner recounted that there was one bullet wound in the left side of the victim's back, and that it had caused the death.

Police officers set out to locate the appellants when Laws and his fellow travelers reported with the dead body. The officers came upon the Bryant car parked on a country road near the scene of the killing. They told that the car was driven away in such manner as to indicate an effort to escape; ultimately they overtook the car. Bryant and Napier managed to elude the officers then, but the two McQueen brothers were retained in custody. Early in December, three weeks after the homicide, appellant Napier surrendered to the police and appellant Bryant was arrested the same day. Bryant said that he and Napier had been together during the three weeks—that they ran away because there had been a killing and they were afraid they would be accused of it.

Bryant admitted that after the shooting he gave McQueen the car keys so that McQueen could put the pistol in the trunk of the car; he professed that he did not do this to "hide" the gun, but that he did not believe the gun should be up front.

The first assertion of error presented by appellants relates to the trial court's refusal to admit evidence of a threat made by Masters toward the appellants. The evidence (offered through witness Paul McQueen) was placed in the record by avowal; in response to inquiry whether Masters had made any statement relating to the three appellants—during the course of the last chase—Paul McQueen said in avowal: "He said he was going to whip Clyde, said if they jumped in, he could take them too or something."

■ It is argued that since self-defense is appellant's theory, any evidence indicating the hostile attitude of the decedent toward the accused is admissible. In support of this argument appellant relies on

Jackson v. Commonwealth, 200 Ky. 316, 254 S.W. 913; Patton v. Commonwealth, 235 Ky. 845, 32 S.W.2d 405; Davidson v. Commonwealth, 261 Ky. 158, 87 S.W.2d 119, and Banks v. Commonwealth, 277 Ky. 647, 126 S.W.2d 1122. The Commonwealth concedes the rule to be that such evidence is admissible, but reasons that its rejection in the present case was not prejudicial. The basis of this argument lies in the fact that the substance of this threat had been admitted into the evidence from the lips of several other witnesses, and from appellant McQueen himself. In support of this position the prosecution points to Martin v. Commonwealth, 178 Ky. 540, 199 S.W. 603; Hicks v. Commonwealth, Ky., 269 S.W.2d 181; Shepherd v. Commonwealth, Ky., 327 S.W.2d 956, and Barton v. Commonwealth, 289 Ky. 595, 159 S.W.2d 424. It is our view that it was error to reject the proffered evidence, but we are unable to perceive that any prejudice resulted. At most, the evidence was cumulative; there was no question that Masters had been the aggressor in the first encounter, nor was it disputed that Masters had been "spoiling for a fight." Under these circumstances, we will not reverse for harmless error. RCr 9.24.

■ The next charge of error relates to a leading question. Dallas Laws, driver of the car in which the victim Masters rode, on re-direct examination testified:

"RD6　Did anybody make any signal out of that car? [Bryant car.]

"A.　Yes, sir. There was an arm come out the window and motioned to us like that.

　　"Mr. Shumate: Object.

　　"The Court: Overruled.

"RD7　And how did you all interpret that motion?

　　"Mr. Shumate: We object.

　　"The Court: Overruled.

"A.　To follow.

"RD8　To follow, and what did you do?

"A.　I was following and I passed them back.

"RD9　As you had earlier agreed?

"A.　Yes, sir.

　　"Mr. Shumate: We object.

　　"The Court: Overruled.

　　"Mr. Shumate: Move the Court to set aside the swearing of the jury and continue the case.

　　"The Court: Overrule the motion."

The assertion of error is directed to RD9, above, as being a leading question suggesting the answer that a previous agreement had been made for the principals, Masters and McQueen, to meet and fight. Conceding that the question may have been leading, we are not able to say that it was a prejudicial error. It is true that appellant Clyde McQueen stoutly denied that he had ever agreed to meet Masters for a fight, but there was ample evidence that Masters had challenged McQueen to a fight, and other circumstances warranted the jury in believing that the combatants had so agreed. Moreover, there was direct evidence that Masters and Laws had agreed that Masters would be taken out to fight McQueen, and the question as propounded could be interpreted as encompassing that agreement. In any event, as the court gave a self-defense instruction, we find that no prejudicial error occurred with respect to this ruling on the evidence.

A more serious question is presented with respect to admission of certain evidence on the direct examination of Paul McQueen (brother of appellant Clyde McQueen). It will be recalled that Paul McQueen (to whom we shall now refer as Paul to distinguish him from his brother Clyde) had ridden with Masters in the Laws car on the first unsuccessful search and on the fatal trip. During the shooting episode Paul

had left the Laws car and gotten into the Bryant car with Clyde and the other appellants. Paul was taken into the police station with Clyde shortly after the shooting.

The prosecution introduced Paul as its witness. The substance of Paul's direct testimony was: That as soon as the shooting started Paul left the Laws car; the Laws car pulled away from the scene; Paul then got into the Bryant car; nobody else got out of the Laws car (this in direct contradiction to Clyde's statement that Masters first got out of the Laws car); Paul did not see any weapon in the possession of any of the appellants, nor did he see any weapon after he entered the Bryant car.

Then the prosecuting attorney proceeded to interrogate Paul with respect to a written statement Paul had given to the police shortly after the homicide. Without interpolating the repeated objections by defense counsel, we quote from the direct questioning of Paul by the prosecution:

"D62 Now, to refresh your recollection, did you not state in there in your statement, 'So we followed for about four miles and Clyde, Napier, and George pulled over—

"D63 '—and jumped out of the car and started firing, and I jumped out of the car and told them to stop shooting and they did.'

"D64 You did say that at the time, to refresh your mind, did you not?

"A. Yes, sir, that in that * * *?

"D65 Yes, sir, that one sentence.

"A. Yes, sir.

"D66 And to refresh your recollection further, did you not state, 'Clyde told them to go on, and put the gun in the window. I told him he had the gun cocked so we was pulling the gun out the

window, and it accidentally discharged.'

"D67 Did you not state that while it was fresh in your mind?

"A. Yes, sir.

"D68 And further to refresh your recollection, 'And Laws pulled off and I got into the car with Napier and Bryant, and we drove around for awhile, and they took three of the weapons to a house, where I do not know.'

"A. Yes, sir."

Further in this interrogation the witness said that the statements which he had made were not true, and that he had been coerced into saying these things by threats from the officers to prosecute him for the slaying of Masters.

■ As early as Champ v. Commonwealth, 59 Ky. (2 Metc.) 17, 74 Am.Dec. 388, this court recognized the rule that a party may impeach its own witness, by proof of contradictory statements, only where the witness testifies positively to the existence of a fact prejudicial to the party, and not where the witness merely fails or refuses to testify as to the existence of a fact that would be favorable to the party. See Click v. Commonwealth, Ky., 269 S.W.2d 203, 205, and cases there cited. The rule has been followed consistently. Cf. Webb v. Commonwealth, Ky., 314 S.W.2d 543. The rule has been sharply criticized also; see 47 Ky.Law Journal 253, et seq., wherein it is suggested that the cited rule should be relaxed at least to permit contradiction of a "turncoat" witness by showing his prior inconsistent, extra-judicial statements if the party offering him is "surprised." In the present case the prosecution made no assertion of "surprise."

■ It is our view that Paul McQueen had merely failed to testify as the prosecution had hoped he would. His testimony

as to the weapons was negative—just that he had not seen any weapons. He was not asked whether he had seen Clyde McQueen, or anyone else, stick a weapon inside the Laws car. He did not say that there was no weapon (he testified as to shooting, so obviously there was at least one weapon), but that he did not see the weapon or weapons. Under these circumstances we cannot escape the conclusion that it was prejudicially erroneous to permit this "evidence" to be "wheelbarrowed" into the record under the guise of refreshing the memory of Paul McQueen.

As to appellant Clyde McQueen, this memory refreshment had the effect of placing sharply before the jury that Clyde's brother Paul had previously said that Clyde did thrust the pistol in the window of the Laws car and did fire the fatal shot into the back of the victim. It may not be doubted that the injection of this "evidence" via this backhanded route was gravely damaging to Clyde McQueen.

With respect to appellants Bryant and Napier, the prior statement of Paul McQueen was the strongest "evidence" of their active participation in the crime. Each of them denied any complicity in the actions of Clyde McQueen, and each denied having any weapon. The Paul McQueen statement reflects that Napier and Bryant got out of the Bryant car with Clyde McQueen, and clearly leaves the inference that the three men were acting in close concert.

Counsel for appellants interposed frequent objections, coupled with motions to set aside the swearing of the jury and for a continuance, as the quoted fragments of Paul McQueen's statement were read to "refresh his recollection." All of these objections and motions were overruled. Appellants' counsel then cross-examined Paul briefly and elicited from him the claim that Paul had made the prior statement under threat of prosecution and imprisonment. At the conclusion of the short cross-examination counsel moved the trial court for an ad-

monition as to the effect of Paul's "statement" testimony, but the motion was overruled.

Later in the trial, after Deputy Sheriff Moberly had testified that Paul McQueen had given the statement voluntarily, and on motion of the prosecution, the trial court did admonish the jury, in pertinent part as follows: " * * * you are admonished that the statement in contradiction of Paul McQueen may be considered by you not as affecting the guilt or innocence of the defendants or any of them but as only affecting the credibility of the witness, Paul McQueen, if in your opinion it does so affect his credibility." Substantially the same admonition was given again following similar testimony from another police officer as to Paul's having made the statement voluntarily. Neither of the latter two officers undertook to detail any of the contents of Paul's prior statement. In view of the very grave nature of the matters contained in Paul McQueen's prior statement, even had it been admissible for impeachment purposes, the belated admonition of the trial court could not serve to remove the heavy damage caused by it.

A somewhat similar situation arose in the trial with respect to witness Bill Milton; he too was asked about prior inconsistent statements, although his testimony as a witness for the prosecution was merely negative in character. There was no specific showing as to what the prior statement of Milton had been, although the prosecuting attorney exhibited a written statement in the presence of the jury, and asked the witness if there was anything untrue in it. At least by inference this must have created the impression that the witness had made statements contrary to his testimony. Upon another trial this tactic will not be permitted.

■ Appellants Bryant and Napier contend that a directed verdict of acquittal should have been given as to them; they moved for such action, but the court denied their motions. In this we think the

trial court was correct. We are mindful of the rule that mere presence at the scene of a crime is not sufficient, of itself, to constitute one an aider and abetter. Ray v. Commonwealth, Ky., 284 S.W.2d 76; 6 Ky.Digest 1, Criminal Law, But "mere presence" in connection with other circumstances may be considered, and may warrant submitting to the jury the issue of guilt as an aider and abetter. Sumpter v. Commonwealth, Ky., 251 S.W.2d 852. We think the circumstances of this case clearly require the submission of the issue of guilt as to both Bryant and Napier. (No such question is raised as to Clyde McQueen.) See, Tinsley v. Commonwealth, Ky., 273 S.W.2d 364; Oldfield v. Commonwealth, Ky., 334 S.W.2d 346; Warfield v. Commonwealth, Ky., 334 S.W.2d 913.

Quite apart from the "statement" of Paul McQueen there is evidence that Bryant and Napier knew of the difficulty between Clyde McQueen and Masters; that more than one weapon was heard shooting during the affray; that Bryant got out of the car with Clyde McQueen at the scene of the shooting; that Bryant gave Clyde McQueen the key to the car trunk in order to enable him to stash away the fatal weapon; that the three men fled the scene together; that Bryant and Napier eluded arrest and absented themselves from the county for three weeks, during all of which the two men were together. Under these circumstances we think it is evident that neither Bryant nor Napier was entitled to a directed verdict.

We need not advert to the claimed errors in the closing argument of the Commonwealth's Attorney, as it is not likely that the same statements will recur. In any event, we are not persuaded that the alleged prejudicial statements in argument were erroneous.

The judgments are reversed as to each of the appellants with directions to grant each of them a new trial.