**Otto THACKER, Appellant,**

**v.**

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

March 25, 1966.

Francis M. Burke, J. A. Runyon, Pikeville, for appellant.

Robert Matthews, Atty. Gen., Robert Preston, Asst. Atty. Gen., Frankfort, for appellee.

DAVIS, Commissioner.

On his trial for the murder of Jimmy Lee Thacker, the appellant, Otto Thacker, was convicted of voluntary manslaughter and sentenced to imprisonment for five years pursuant to a jury's verdict. KRS 435.010; 435.020. A reversal of the judgment is sought on these grounds, as stated by appellant in his brief: (1) prejudicial error was committed in the admission of incompetent evidence offered by the Commonwealth, and (2) prejudicial error was committed by permitting the Commonwealth to read to the jury the transcript of the testimony given by Willard Reed Adkins on a former trial of this case.

The homicide occurred on December 24, 1963, at about ten p. m., in a small restaurant operated by Grace Chaney at Millard, a community in Pike County. There were seven people in the Chaney restaurant during the course of the events involved in this case. They were: Grace Chaney, the owner; Pearl Hardin, a waitress; Bill Ratliff, a customer—none of whom participated to any appreciable extent in the melee involved; the other members of this tragic cast were the appellant, Otto Thacker, and his companion, Willard Reed Adkins; these latter two had arrived at the scene shortly before Jimmy Lee Thacker, the victim, and his friend, Paul Ed Justice. In an effort to minimize confusion, we shall refer to Otto Thacker as appellant, Jimmy Lee Thacker as the victim and use the surnames of the other actors in the drama.

The night was bitter cold; the highways were burdened with snow and ice. The Chaney restaurant was heated by a coal stove. Appellant and Adkins entered the restaurant a short time before the victim and Justice arrived; Chaney, Hardin and Ratliff were already there when appellant and Adkins came in. Adkins was sitting in a chair—with the back of the chair turned in front of him—near the stove. Appellant was seated in a booth with Hardin; Chaney was standing nearby appellar

The record reflects that all seven of the persons named had consumed some alcoholic beverages; the extent of the drinking is not clear, but as to appellant, Adkins, the victim, Justice and Ratliff, the evidence indicates that each had had "several drinks."

When Justice and the victim entered the restaurant, the victim uttered a "to whom it may concern" inquiry—"Why don't you have a G—— D—— fire built?" Adkins replied, "We kept a fire last night, it's your turn tonight." The fatal struggle was precipitated.

The victim apparently seized the chair on which Adkins was seated, and, according to Adkins, the victim "stomped" Adkins in the stomach. These two men became locked in close combat, with Adkins being "down" most of the time. Justice entered the fray in support of the victim. Various convenient missiles were hurled, including catsup bottles, cups, pickle and mustard jars and anything available. There is some evidence (to which we shall later refer in greater detail) which indicates that appellant intervened in the fight, and that the violent combat ceased abruptly just after appellant became a participant.

Appellant and Adkins left the restaurant in a hurry. They entered appellant's car and drove away, but not before Justice had attempted to halt the car's progress by shooting at its tires with a .22 caliber pistol. A couple of the bullets struck the car, but did not serve to impede its departure.

There was evidence indicating that the victim had left the restaurant and approached the appellant's car, begging to be taken to the hospital—this is denied by appellant.

Justice noticed that the victim was bleeding profusely just after appellant and Adkins left. He observed a small cut on the victim's throat, from which the blood was flowing freely. Justice drove the victim to the hospital at Pikeville, some eleven miles away. There was some slight lapse of time —just how much lapse is not clear—between the end of the fighting and the departure of Justice and the victim for the hospital. The victim died about five minutes after he reached the hospital, as the result of the stab or cut wound upon his throat.

Pearl Hardin, the waitress, testified that she had a minor role in the fighting. While the victim and Adkins were wrestling with the chair, Hardin "grabbed at the chair," but "didn't catch it." She said that she "got hold" of the victim at one point, but he hit her, and in her words: " * * * and from then on I couldn't do nothing with them. I tried to keep them apart, but I couldn't do nothing with them by myself." After all the men had left, Hardin assisted Chaney in mopping and cleaning up the mess. During this she found a knife in the area where some of the fighting had occurred. It was identified as a "Tree" brand, three-blade pocket knife. The largest of the three blades of the knife was partially open when Hardin found it. It should be observed that another knife, identified as a "Case" knife, was pointed out to an officer by Chaney, four days after the killing. The latter was behind the refrigerator, but in plain view, the officer said. The "Tree" knife was in a broken pop-bottle, and the officer said that a red substance was visible on the "Tree" knife and along the top edge of the broken bottle. There was evidence linking appellant with one of the knives. There had been an earlier trial of this case, at which the jury was unable to agree. Hardin had testified in the first trial. The Commonwealth had procured an indictment against her for false swearing after the first trial, predicated upon her testimony in the first trial. At the trial from which this appeal arises Hardin had her personal counsel to protect her interests as she was interrogated. The first claim of error by appellant relates to the questioning of Hardin. After numerous preliminary ques-

tions, the attorney for the prosecution asked whether Hardin had seen the appellant approach the victim and Adkins as they were fighting, and, omitting objections and rulings, this occurred:

"Q 118. My question is were you there, or did you see Otto Thacker come up there where those boys, Reed Adkins and Jimmy Lee Thacker, were wrestling on the floor there?

A. No, I never seed Otto come in.

Q 119. You didn't see him come in?

(No answer to this question appears of record)

Q 120. You testified before the Pike County Grand Jury in March of 1964 in this case, did you not, Pearl?

A. Yes, sir.

\*    \*    \*    \*    \*    \*

Q 122. I will ask you if this question was asked you, and if you made this answer—

\*    \*    \*    \*    \*    \*

Q 123. Did you see Otto Thacker rush up where these boys were fighting?

A. Let me explain this to you. You see, they were throwing teacups and everything they could get their hands on, and when I run to him and grabbed hold of him and after this, Jimmy Lee Thacker was laying on the floor—well, standing on his feet, and when I took his arm and pulled him away, this knife, or whatever it was, flew out of his hand.

\*    \*    \*    \*    \*    \*

Q 124. Do you remember making that statement? Out of whose hand?

\*    \*    \*    \*    \*    \*

Q 125. Out of whose hand?

\*    \*    \*    \*    \*    \*

'Q 126. Out of whose hand?

A. Otto Thacker's'
Did you make the answer—

A. No.

Q 127. I will ask you if this question was asked you and if you made this answer:

'Q. You saw the knife in his hand?

A. No, not for sure in his hand, when I jerked his arm, I saw the knife hit the floor'.

(No answer to the question appears of record)

Q 128. I will ask you if this question was asked you and did you make this answer?

'Q. Was Otto Thacker's hand near the throat of Jimmy Lee Thacker?

A. Yes, it was.' "

(No answer to the question appears of record)

The witness had not made any positive assertion that appellant did or did not do anything. Her testimony was negative. She was offered as a witness for the prosecution. The questions and answers extracted from the testimony of the witness before the grand jury did not contradict any affirmative testimony given by the witness at the trial. In these circumstances, we are not able to distinguish this case from Davidson v. Commonwealth, Ky., 394 S.W.2d 911; McQueen v. Commonwealth, Ky., 393 S.W.2d 787; Click v. Commonwealth, Ky., 269 S.W.2d 203 and Webb v. Commonwealth, Ky., 314 S.W.2d 543. The admission of the prior "inconsistent" statements was erroneous and prejudicial.

Complaint is made that the transcript of the testimony of Adkins on the first trial was permitted to be read as the evidence of Adkins on the second trial. The prosecution announced ready when

the case was called for the second trial, and made no intimation that Adkins would not testify in person. However, on the third day of the trial counsel for the prosecution made known to the trial judge that Adkins was not available. A voir dire hearing reflected that subpoena had been timely issued for Adkins, and diligent efforts had been made to locate him—all negatively. Thereupon the court permitted the transcript of Adkins' prior testimony to be read. In the circumstances at hand this was proper. See RCr 7.22 and Noe v. Commonwealth, Ky., 396 S.W.2d 808. All of the requirements upon which such procedure must be predicated are present here. Therefore, it was proper to permit the transcript to be read, but it was subject to objections as to relevance and competence.

■ The appellant contends that the same error was committed as to Adkins as occurred with respect to Hardin, in that his prior "inconsistent" statements were made the basis for "contradiction" of negative testimony. However, we find that Adkins substantially admitted that he had made the former statements and that they were true. Inasmuch as the problem at hand seems to arise with increasing frequency, we deem it appropriate to observe that when a "turncoat" witness—or one who evinces a predeliction to recant from a former incriminating statement—has failed to testify to any affirmative fact, the prosecution (or defense) should ask leave of the trial judge to examine the witness in chambers in an effort to refresh his recollection, by use of the prior statement, if desired. It may be that the memory of the witness will indeed be refreshed, in which event it would be appropriate to question the witness before the jury in due course. On the other hand, if the witness denies the statement, and persists in his lack of recollection, the adverse and improper effect of permitting the jury to hear the purported statement read will be avoided. We point out that it may or not be appropriate to use the prior testimony of Ad-

kins at another trial, depending upon the then showing as to his availability and the diligence in obtaining his presence.

The judgment is reversed for proceedings consistent with the opinion.