Joe Dick ASKEW, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Court of Appeals of Kentucky.

Feb. 7, 1969.

Joseph J. Grace, Joseph S. Freeland, Paducah, for appellant.

J. Albert Jones, Paducah, John B. Breckinridge, Atty. Gen., Joseph H. Eckert, Asst. Atty. Gen., Frankfort, for appellee.

STEINFELD, Judge.

Joe Dick Askew was indicted for robbing George Lamb on or about March 20, 1967, by the use of a gun. KRS 433.140. After a plea of not guilty his trial resulted in a hung jury. On the second trial he was convicted and sentenced to ten years in the penitentiary. From a judgment pursuant to the jury verdict on that second trial he appeals. We affirm.

Lamb, who lived in Calvert City (which is between Kentucky Lake and Paducah), after fishing on the lake during the day of the alleged robbery drove his pickup truck to Charles Pickett's restaurant in Paducah arriving there about midnight. There was evidence, denied by Lamb, that while at Pickett's Place Lamb drank some beer. He met Calvin Thomas and they went in Lamb's truck to the Amvets Club "for a drink."

Lamb said that they had one drink at the club and when he walked to his truck three men came up and one of them held a gun on him and robbed him of his billfold containing $170.00. He testified that Thomas was somewhere behind him during the robbery. Lamb and Thomas returned to Pickett's Place arriving there at an early hour in the morning. Lamb requested that Pickett call the police and Detective Coleman came in response to the call. Testimony was presented that Thomas informed the detective that he too had been robbed at the same time; that appellant Askew was the robber and that Thomas offered to sign a complaint against Askew. Coleman drove Thomas and Lamb to the city police judge's house where only Thomas swore to a warrant charging Askew with robbing him. Askew was arrested and a few days later in the police court Thomas repudiated his identification of Askew whereupon the charge was dismissed. Subsequently, Lamb identified Askew from a picture shown him at the city hall and the present prosecution was instituted.

On the trial, Lamb, Pickett, Coleman and Thomas were called on behalf of the Commonwealth. Thomas stated that he had been drinking when he met Lamb at Pickett's restaurant; that he accompanied him to the Amvets Club but that he did not clearly remember what happened. He said at first he thought that he had been robbed but later realized that he was incorrect. He also stated that he did not see Joe Dick Askew or see anyone rob Lamb with a gun. He contended that Detective Coleman had suggested to him that Askew had committed the robbery. The Commonwealth attorney then vigorously interrogated Thomas, frequently using leading questions.

The following interrogations of Thomas illustrate the type of examination of which appellant complains:

"44. What happened as you got near the truck?

A. Didn't nothing happen.

45. Didn't a single thing happen? You didn't see anybody?

A. Yeah, there was some men standing out there by the service station.

\* \* \* \* \* \*

47. Anybody come up to you? Anybody put a knife at your throat?

(Counsel for appellant's objection to these leading questions was overruled.)

\* \* \* \* \* \*

49. Did anybody take any money from you?

A. No.

50. Did you see Joe Askew there?

A. No, I didn't.

\* \* \* \* \* \*

52. Did you see anybody put a gun in Mr. Lamb's—(interruption).

A. No, I did not.

\* \* \* \* \* \*

55. Did you tell the police and tell Mr. Pickett—well, first, did you tell Mr. Pickett, as soon as you arrived over there that you were robbed and that somebody put a knife to your throat?

(Attorney for appellant objected and asked 'the Court to admonish the jury not to consider this'. The objection was overruled.)

A. I told him that I thought that I had been robbed. And he asked me, 'Who?' And I never said.

(Attorney for appellant objected but the objection was overruled.)"

Later he said he didn't remember because he was intoxicated. He claimed that he dropped the warrant against Askew because he couldn't identify him and his "$.80 was laying on the dresser and (he knew he) wasn't robbed."

Appellant contends that "the real purpose of the Commonwealth in calling Thom-as \* \* \* was to lay the foundation for the introduction of incompetent and inadmissible testimony by Detective Coleman, in the guise of impeaching Thomas." Coleman was asked about his conversation with Thomas and answered:

"7. Did he make any statement to you concerning who committed the robbery upon he and Mr. Lamb, if one was committed upon him?

A. He did.

8. What did he say?

A. Well, at first I asked him who done it and he said—(interruption).

Mr. Grace: I want to object to this conversation. It was outside the hearing of the defendant and he's got no way to cross-examine on it, or to deny it, rather.

By the Court: I'm going to overrule the objection. Go ahead.

\* \* \* \* \* \*

A. I asked him—I asked Calvin who robbed him and he said, 'I'm afraid to tell you.' So I told him, I said—

\* \* \* \* \* \*

10. Alright?

A. So I said, 'If someone robbed you—' (interruption)

By the Court: You needn't say what you said. Just say what you heard.

A. Alright. And he said, 'I'm afraid to tell you.' And I asked him again and he said, 'Well', he said, 'It was Joe Askew.'

11. Did he say anything about his being robbed?

A. Yes, he did.

12. What did he say?

A. He said that Joe Askew put a knife on his neck and robbed him of 80¢.

13. He said Askew put a knife on his neck?

A. Yeah.

(Counsel for appellant's objection was overruled.)"

Appellant claims that Thomas was badgered and browbeaten which was "impermissible in itself and created an atmosphere of basic unfairness * * *" and that this examination was for the purpose of creating "with the jury the impression that somebody had been monkeying with the key witness for the Commonwealth." Appellant asserts that Thomas was cross-examined as an unwilling or hostile witness under CR 43.05 and RCr 13.04. He argues that the right to cross-examine is not absolute, that it is permissible only in instances in which the party calling the witness is "surprised by such testimony" and cites 117 A.L.R. 327. He says that the Commonwealth was not surprised by the testimony of Thomas because it knew from the police court proceedings that Thomas would not implicate Askew in the robbery and he relies upon Young v. United States (CCA 5) 97 F.2d 200, 117 A.L.R. 316 (1938), a criminal prosecution, in which it was said:

"The rule in its original and strict form against impeaching one's own witness is discredited everywhere, and it is generally recognized that impeachment may be resorted to where a witness has surprised the party offering him, by his testimony. The overwhelming weight of authority however, supports the rule that though trial courts should, in the exercise of a sound discretion to prevent injury from the surprise testimony of a hostile or corrupt witness, permit cross examination and impeachment by contradictory statements, it is never permitted to make of the rules an artifice by which inadmissible matter may be gotten to a jury through the device of offering a witness, whose testimony is known to be adverse, in order, under the name of impeachment, to get before the jury for its weighing, favorable ex parte statements the witness has made. To the relaxation of the rule against impeaching one's own witness by introducing his ex parte statement in contradiction of his testimony, it is fundamental, we think, that the party offering the witness be really surprised at his testimony."

The Commonwealth notes that at the first trial of Askew for robbing Lamb, which resulted in a hung jury, Thomas testified that there had been a robbery, but presently he denies that one occurred. It also replies that the above rule with respect to surprise, "while indicative is not controlling"; that a proper statement of the rule is "that a hostile witness may be impeached by prior contrary statements without reference as to which party calls such witness if the intent is truly to impeach a positive statement presently made and not merely an attempt to place before the jury evidence which would not otherwise reach the jury, i. e., a vehicle to place before the jury impeaching evidence." The Commonwealth also insists that the evidence adduced from Thomas constituted a bona fide impeachment process. It relies on McQueen v. Commonwealth, Ky., 393 S.W.2d 787 (1965); Champ v. Commonwealth, 59 Ky. (2 Metc.) 17, 17 Am.Dec. 388 and Thacker v. Commonwealth, Ky., 401 S.W.2d 64 (1966).[1]

It is pointed out by the Commonwealth that counsel for Askew conceded that Thomas was either unwilling or hostile; therefore, it says CR 43.05(1) or (3) authorized the prosecuting attorney to interrogate Thomas as if he had been under cross-examination. CR 43.05 provides that:

"A leading question is a question that suggests to the witness the answer which

1. See Jett v. Commonwealth, Ky., 436 S.W. 2d 788 (decided January 31, 1969), over-ruling Champ v. Commonwealth and other cases following it.

the examining party desires, and such questions may only be used:

(1) To interrogate any unwilling or hostile witness.

(2) On cross-examination by the adverse party only upon the subject matter of the examination in chief.

(3) In all cases where special circumstances make it appear that the interests of justice require such interrogation."

Few questions had been asked Thomas when the trial court, in passing on an objection stated: "This witness seems rather reluctant to testify * * *", and so it appears to us.

It seems to us that no error was committed by the trial court as it exercised its discretion in controlling the examination of Thomas.

"Leading questions are not to be commended, but the permission of them is within the discretion of the trial court, and the judgments will not be reversed for this unless the court has abused his discretion and a shocking miscarriage of justice has resulted." Meredith v. Commonwealth, 265 Ky. 380, 96 S.W. 2d 1049 (1936). Cf. 98 C.J.S. Witnesses § 477, p. 357.

The out-of-court statements said to have been made by Thomas were admissible as substantive evidence under the rule announced in the recent case of Jett v. Commonwealth, Ky., 436 S.W.2d 788 (decided January 31, 1969). Hence, it is immaterial that they may have been technically objectionable for impeachment purposes.

The defense of Askew, an alibi, was that he was not at the Amvets Club when the robbery occurred. Thomas knew Askew, therefore, his recognition of him and his report to the police that Askew robbed the two men were important. It corroborated Lamb's identification of As-

kew from pictures in the police files. We do not find that the use of Thomas or Coleman as witnesses was improper or for a wrongful purpose. Jett v. Commonwealth, Ky., 436 S.W.2d 788 (decided January 31, 1969).

The judgment is affirmed.

All concur.